R. W. WEBSTER, Administrator of Estate of LENA DITTBURNER, ET AL., Appellants, v. G. W. LEIMAN ET AL.—44 S. W. (2d) 40.

Division One, November 20, 1931.

*J. D. Harris* and *Howard Gray* for appellants.

*Mercer Arnold* and *Ray Bond* for respondents.

1236

FRANK, J.—Action to contest the will of Ludwig H. Stebbins. The suit was brought upon the grounds that the testator was mentally incapable of making a valid will, and that the will was the product of undue influence exercised over the mind of the testator by W. T. Sabert and G. W. Leiman. Verdict and judgment sustaining the will, and plaintiffs appealed.

Stebbins was eighty-six years of age at the date of his death. He died in Jasper County, Missouri, on October 20, 1926, single and unmarried and without issue, his wife and children having predeceased him. This suit was brought by his only heirs who were a surviving sister, Lena Dittburner, and the children of John C. Stebbins, a deceased brother. Shortly before the trial in the circuit court, Lena Dittburner died, and the cause, as to her, was revived in the name of R. W. Webster, administrator of her estate.

Neither of the plaintiffs is a beneficiary under the will. The will was executed on October 1, 1926. By its terms testator bequeathed to the Sarcoxie Cemetery Association the sum of $500 for the care of his and his son Fred's grave; to Mrs. M. A. Knight, $500; to Mrs. Minnie Broam, $500; to Mrs. Marie Marella, $300; to N. R. Foster, $200; to J. C. Rosebrough, $100; to Mrs. Sullivan, 2619 E. 11th St., Kansas City, Missouri, $300; to each church located in Sarcoxie, Missouri, the sum of $100; to the Scottish Rite Cathedral, Joplin, Missouri, $100; to the Abou Ben Adham Temple, at Springfield, Missouri, $100; to G. W. Leiman, a certain described eighty-acre tract of land in fee simple, subject to the encumbrance thereon; to O. H. Lambeth, G. R. Overall and Carl Difenderfer each the option to purchase certain described lands, and empowering the executor named in the will to execute deeds to said purchasers.

The will devised the remainder of testator's estate to F. S. Park, G. W. Leiman and E. W. Johnson, as trustees, with power to sell and convey any part thereof which they might think proper or necessary for the best interest of the estate, and directed them to have constructed and laid a water pipe from a connection with the water system of Sarcoxie, Missouri, to the Stebbins Park, sufficient to supply said park and the public with water, said pipe to be laid within ten years from the date of testator's death. The will directs

the trustees to extend the remainder of said trust estate for the benefit and support of such poor people of Sarcoxie, Missouri, as the trustees may select and deem most needy and worthy, and if any part of said estate remains on hand the trustees may use it to assist in the erection of a public-sales pavilion in said city. The will appoints W. T. Sabert executor, to act without bond, and empowers him to sell and convey any part of said estate that he, in his discretion, might think was for the best interest of the estate.

The substance of the charge in plaintiff's petition is that the testator was mentally incapable of making a will and that the purported will was the product of undue influence exercised over the mind of testator by W. T. Sabert and G. W. Leiman. There was much evidence, pro and con, on the question of whether or not testator was mentally capable of making a will, and that issue was submitted to the jury. No complaint is lodged in this court against the instructions submitting that issue to the jury or against the jury's verdict on that issue in favor of the validity of the will. In this situation, the issue of testator's mental capacity to make a will is not an open question here and we need not give it further consideration.

The only question for our determination is whether or not the trial court erred in refusing to submit to the jury the alleged issue that the will was procured by the undue influence of W. T. Sabert and G. W. Leiman.

Undue influence need not be proven by direct evidence, but may be shown by or inferred from the facts and circumstances in evidence. [Mowry v. Norman, 204 Mo. 173, 193, 103 S. W. 15.] Keeping in mind this rule, we will first determine whether or not there was any substantial evidence tending to support the charge that W. T. Sabert unduly influenced the testator in the making of his will.

There was no evidence that Sabert ever talked to testator about the disposition of his property or who should be the objects of his bounty. Appellants do not claim there was any such evidence. Their first contention is that there was evidence that Sabert had charge and control of testator's financial affairs, which facts tended to prove the existence of a confidential relationship between Sabert and testator, thereby giving rise to the presumption that the will was the product of undue influence exerted by Sabert. We do not find any substantial evidence tending to support the claim that Sabert had charge and control of testator's financial affairs. But if there had been such evidence it would not avail appellants. Proof that Sabert had charge and control of testator's business affairs would tend to establish the existence of a confidential relationship between Sabert and testator, but it would not tend to show that he actually exerted an undue influence over the testator in the making

of his will. Neither would the showing of a confidential relation-ship give rise to a presumption of the exercise of undue influence, for the reason that Sabert was not a beneficiary under the will. It is true that when a confidential relation is shown to have existed between a testator and a beneficiary under his will, an exerted undue influence will be presumed to have induced the bequest, and the burden is shifted to such beneficiary to show that the will was not the product of such influence. But it is equally true that the existence of a confidential relation between a testator and one who is not a beneficiary under the will, does not give rise to a presumption that the will was the result of undue influence and does not shift the burden to the proponents of the will to prove that such will was not the product of undue influence. [Bushman v. Barlow, 292 S. W. 1051, 1053; Lane v. St. Denis Catholic Church, 274 S. W. 1103, 1105; Ryan v. Rutledge, 187 S. W. 877, 878.] As before stated, if it should be conceded that the evidence tended to show that Sabert had charge and control of testator's financial affairs, such evidence would not tend to show that he unduly influenced testator in the making of his will, nor would it give rise to a presumption that he did so. In this situation, we see no reason for reviewing the evidence touching that question.

There being no presumption of the exercise of undue influence by Sabert, the next question is whether or not there was any evidence tending to show that he actually exercised such influence. Contention is made that undue influence was shown by the fact that Sabert called Mr. Hackney, a lawyer living at Carthage, to come to testator's home and write his will. Sabert was cashier of a bank in Sarcoxie and testator was a customer of the bank. On September 17, 1926, testator went to the bank and requested Sabert to call Hackney, which he did. Hackney could not come at that time, and testator told Sabert that there was no hurry about it, and that he would let him know personally or send him word when to call Hackney again. On September 23, 1926, one E. C. Williams met Mr. Sabert on the street and told him that testator wanted him to come out and bring Judge Norton and make his will. Sabert said, "That is not the understanding Mr. Stebbins left with me. He left word with me that he would let me know personally or send me word when he wanted me to call Ben Hackney." Judge Norton was not in town at that time. Following this conversation Sabert went to the bank and called Hackney who reported at the bank the next morning. He did not know where Stebbins lived, so he requested Sabert to go with him, which he did. There is no evidence that either Hackney or Sabert at this time or at any other time made any suggestions to testator as to the disposition of his

1240

property or who should be the recipients of his bounty. Testator told Hackney how he wanted to dispose of his property, gave him the names of his beneficiaries and the amount to be given to each, and told him why he was thus disposing of his property and why he was not leaving it to his relatives. Hackney made notes of what the testator told him, then returned to the bank and wrote the will on the typewriter in accordance with the notes so taken. After the will was prepared Hackney and Sabert returned to testator's home, taking with them a Mr. Lewis to act as a witness to the will. On arriving at the home, testator informed Hackney that he had just learned Mrs. Dixon, one of the beneficiaries in the will, had died and asked him what effect her death would have on the bequest made to her. Hackney told him that he thought the bequest would lapse—never take effect. Testator then said that he might want to make some provision for Mrs. Dixon's people, and there was also another matter he had not settled upon that he might want to put in his will later. He then signed the will and Hackney and Lewis signed it as witnesses. On Hackney's first visit he asked testator whom he wanted for witnesses. Testator replied, "You can serve as one and you bring any friend you happen to pick up down there." Hackney left testator with the understanding that he could later make any changes in his will that he might desire to make.

The testator had directed Hackney to make provision in the will that in event of the failure or refusal of a trustee to act, the remaining trustees were authorized to fill the vacancy. Hackney testified that after the will was executed and after he returned home, he discovered that he had omitted to include such a provision in the will. He then rewrote the will, adding this omitted provision and omitting the bequest made to Mrs. Dixon in the first will. In all other respects the second will was the same as the first. On October 1, Hackney returned to testator's home, taking Joe Kampf with him to act as a witness to the second will. Hackney asked testator what he had decided about Mrs. Dixon's people. Testator replied that he had taken care of her burial expense and her doctor bill and had decided that he would not do anything further for the Dixons. He also told Hackney that since the making of the first will, he had deeded to O. H. Lambeth the eighty acres which the first will gave him an option to purchase, and had instructed George Leiman, executor of his son Fred's estate, to pay off the $1600 encumbrance on the eighty acres which the first will gave Leiman. Hackney testified that he then went over the will with testator, and testator said it was all right, it suited him, but there might be some change he would want to make later. Hackney then said, "I told him any time he wanted me he could call me and I would come and fix it some way, either a codicil or a new will." The second

will was then signed in the presence of Hackney and Kampf who signed it as witnesses. Sabert was not present when the second will was executed.

There was no evidence that any improper motive prompted Sabert to call Hackney to come to testator's home and write his will. On the contrary, the only legitimate inference to be drawn from the evidence touching that question is that Sabert was justified in believing that he was complying with testator's wishes when he called Hackney the second time. But suppose he had called Hackney without suggestion or authority from the testator, that fact, standing alone, would not justify the submission to the jury of the issue of undue influence on the part of Sabert. There was no evidence that Sabert and Hackney talked between themselves about the disposition of testator's property or what kind of a will he should make, or that either of them ever talked to the testator about the disposition of his property or suggested to him, either directly or indirectly, who should or who should not be beneficiaries under his will.

It is next contended that Sabert admitted that he called upon testator and had him execute the deed to the eighty-acre tract of land to Lambeth after the will was made.

The record does not show that Sabert made any such admission. Both wills gave Lambeth an option to purchase this land. There was no evidence that Sabert, Lambeth or anyone else ever attempted to influence the testator to execute this deed or take any advantage of him with respect thereto. Neither was there any evidence that Lambeth did not pay a fair price for the land. Sabert's only connection with the transaction was in the capacity of notary public in taking the acknowledgment to the deed.

One E. C. Williams testified that he met Sabert about the first of August and asked him if Mr. Stebbins had made a will; that Sabert replied he had not, but they were going to make one right away; that Williams said, "You will have to go over there right away, because I don't think the old man is going to last very long," and Sabert replied, "There will be a man over tomorrow to make it, and if we make it we want it so it will hold." Plaintiff relies on this circumstance as evidence tending to show undue influence. No one called to write Stebbins's will at the time mentioned in this conversation. The alleged statements of Sabert, who was not a beneficiary under the will, is no evidence that he unduly influenced testator in the making of his will which was made two months later, especially so, in the absence of any evidence that Sabert ever at any time talked to testator about the disposition of his property or attempted in any manner, either directly or indirectly, to influence him in the making of his will.

The character of evidence necessary to break a will on the ground of undue influence has been tersely defined by this court in the following language, "The undue influence that will break a will must be present, in active exercise and rise to the mark of such overpersuasion, coercion, force, fraud or deception, as breaks the will power of testator and puts in its stead the will of another." [Turner v. Anderson, 236 Mo. 541, 139 S. W. 184.] Measured by this rule, the circumstances upon which appellants rely do not tend to prove undue influence on the part of Sabert.

We next take the charge that the will was the product of undue influence exerted by G. W. Leiman.

Leiman was a beneficiary under the will. There is no direct evidence that the will was the result of his undue influence. But as undue influence may be inferred from the facts and circumstances in the case if they are sufficient to warrant such an inference, we will consider the case from that viewpoint.

Testator's son Fred died shortly before the death of testator, leaving testator as his only heir. Fred was a substantial property owner, owning considerable real estate. He served as a soldier in the Spanish-American War. While away in that service, Leiman had charge of his lands and property. After he returned from the war, Leiman continued in charge of his property. During this time he was in ill health and went to Kansas City for treatment for mental trouble. Before going he gave Leiman power of attorney to look after his business. Soon after going to Kansas City, he was committed to an asylum at Nevada and Leiman was appointed his guardian and curator. Shortly thereafter he died, leaving a will by the terms of which he bequeathed to his father, Ludwig H. Stebbins, all of his property and named him as executor of the will. The father relinquished his right to administer the estate and requested that Leiman be appointed as administrator in his stead. Leiman was appointed and proceeded to administer the estate.

It is claimed that immediately upon the son's death, Leiman took charge of the father's affairs and under his dominating influence the father was caused to renounce his right to administer upon his son's estate and request that Leiman be appointed as administrator thereof.

There is no evidence that Leiman or anyone else ever suggested, either directly or indirectly, that Ludwig H. Stebbins renounce his right to administer upon his son Fred's estate or that Leiman be appointed administrator thereof. The circumstance upon which appellants rely in support of this contention is that Leiman presented the son's will for probate and requested the appointment of himself as adminstrator of the estate.

At the time this will was presented for probate, Leiman informed the court that Ludwig H. Stebbins who was named as sole beneficiary and executor of the will was willing that he administer the estate. He also informed the court who his sureties would be in event he was appointed as administrator. The evidence was that it would be inconvenient for either Stebbins or the proposed sureties on the bond to appear in court at that time to execute the renunciation and the bond. A written renunciation for Stebbins and an administrator's bond for Leiman were then prepared and taken back to Sarcoxie where they were duly executed and returned to and approved by the probate court. For aught the evidence shows all this was done at the request and direction of Ludwig H. Stebbins. In the face of his written renunciation of his right to administer the estate, and his written request that Leiman be appointed as administrator, and in the absence of any evidence that such was not his desire, the circuit court could not lawfully say that there was any substantial evidence that such was not his voluntary act. In addition to this, it is not unnatural that a man eighty-six years of age would desire to be relieved of the details of the administration of an estate. Neither is it strange that he would select Leiman, whom the evidence shows was not only a friend and confidant of his deceased son, but was familiar with his business affairs.

Complaint is made that Leiman sold at public sale some of the personal property belonging to Fred's estate before letters of administration were issued to him.

Leiman did hold a public sale and sell some of the property before letters of administration were actually issued to him, but the evidence explains how this happened to be done. Stebbins had renounced his right to administer and requested that Leiman be appointed in his stead. Arrangements had been made for the appointment of Leiman, but the actual issuance of letters to him had been delayed, due to difficulty in locating one of the subscribing witnesses to the will who had moved from the neighborhood. Leiman knew he was to be appointed as administrator and was of the opinion that in order to avoid loss to the estate, the personal property should be sold at an early date. He consulted the probate judge about the matter who advised him to use his own judgment about selling any property that might be perishable or a loss to the estate before proof of the absent witness to the will could be obtained. No claim is made that the property sold did not bring a fair price, or that Leiman did not properly account to the son's estate therefore. Conceding that Leiman had no authority to make the sale before the grant of letters of administration, the fact that he did so under the circumstances

1244

shown is no evidence of a fiduciary relation between him and the father or that he attempted to influence the father in the making of his will.

During the course of administration of the son's estate, Leiman looked after the land, collected the rents thereon and as administrator accounted therefor to the estate. Legally, the father who was the sole beneficiary under his son's will, and not the administrator, was entitled to the possession of the land and the income therefrom. Leiman testified that he understood that it was his duty as administrator to look after the land. The fact that he accounted to the estate instead of to the father for the rents collected indicates that he thought he was managing the land for the estate instead of for the father. At least this circumstance does not amount to substantial evidence of a fiduciary relation between Leiman and the father.

It will be remembered that both the first and second will of Ludwig H. Stebbins bequeathed to Leiman an eighty-acre tract of land subject to an existing encumbrance of $1600. This eighty-acres was a part of the land which Ludwig H. Stebbins received under his son Fred's will. Complaint is made of the fact that Leiman, as administrator of the son's estate, paid off this $1600 encumbrance out of funds in his hands belonging to the son's estate. The evidence concerning this payment is that it was made at the direction of Ludwig H. Stebbins. Hackney, the lawyer who drew both wills, testified that at the time the second will was executed, Stebbins told him that since the making of the first will he had directed Leiman to pay off this $1600 encumbrance out of funds in his hands belonging to his son Fred's estate. Leiman testified that at the time he made this payment, he did not know that Stebbins's will gave him this eighty acres. Both Hackney and Sabert who knew the contents of the will, testified that they did not tell Leiman that he was named as a beneficiary therein. But suppose Leiman had paid off this encumbrance without any directions from Stebbins, that fact might tend to show that he was unfaithful to his trust, but it would be no evidence of a confidential relation between him and Stebbins, or that he had theretofore unduly influenced Stebbins in the making of his will.

Shortly before Stebbins's death, he made some gifts of personal property to Mrs. Knight, his housekeeper. Contention is made that Stebbins was so subservient to the will of Leiman that he could not make these gifts to his housekeeper without Leiman's permission. It is claimed that the testimony of witness Hagar supports this contention. The substance of his testimony was that Stebbins would call Leiman to his bedside and tell him what he wanted Mrs. Knight to have and

he wanted him to see that she got it, and that Leiman would say to Mrs. Knight, "You can have it. I will see that you get it." This evidence shows that Stebbins was directing Leiman what to do, instead of Leiman attempting to influence him. In addition to this, Mrs. Knight, appellants' own witness, testified that Stebbins called her to his bedside and told her what he wanted her to have; that she said to him, "Don't tell me, tell somebody else;" that she, and not Stebbins, called Leiman in; that she thought if there was any trouble in the future about the gifts, if she had a witness it would be all right. Hagar also said that these gifts were made to Mrs. Knight "through Leiman because Leiman was supposed to be the advisor or whatever you call it." This statement was an opinion and conclusion of the witness without any facts upon which to base it.

Another circumstance relied upon by appellants as tending to show that Leiman was the trusted agent of testator in the transaction of his business affairs, was that testified to by J. B. Oliver. He testified "that after Fred died, Leiman was not only looking after Fred's estate, but the old man's business also; but after Fred's death Mr. Stebbins told him he was not looking after his own affairs at all, and to see Leiman if any business transaction came up; that he was unable himself and had turned it over to Leiman."

The statement that Leiman was looking after Stebbins's business affairs was a pure conclusion of the witness without any facts or circumstances upon which to base it. The further statement that Stebbins told witness that Leiman was looking after his business affairs, standing alone, does not amount to substantial evidence of agency. If wills could be set aside on what some witness claimed the testator had told them, absent other evidence, either directly or through presumption, tending to show the exercise of undue influence, no one could die with any reasonable expectation that his wishes, as expressed in his will, would be carried out. One circumstance to which witness Oliver testified was a conversation he had with Stebbins concerning the renting of some corn land for the coming year. One Foster was farming the land at the time. When witness asked Stebbins about renting the land, Stebbins told him that he would see Foster and if Foster did not want the land, witness could have it. This part of the conversation shows that Stebbins was transacting his own business. When witness started to leave, Stebbins told him that Leiman might have made some other arrangements; that he would see Leiman and see what he said about it. This latter statement is consistent with the idea that Stebbins had told Leiman to rent the land and that he wanted to find out whether or not he had done so, before renting it to some one else.

1246

Oliver also testified that at the public sale of the personal property of Fred's estate, he inquired of Stebbins about the sale of some carpenter tools and Stebbins told him to see Leiman about it. Leiman was conducting this sale as administrator of Fred's estate. He, and not Stebbins, was the proper person to answer inquiries concerning the sale of the property.

Alleged statements of Leiman are relied upon as showing the exercise of undue influence by him.

Mrs. Knight testified that she had a conversation with Leiman some time after Stebbins's death in which he said to her that if they found out who notified Mr. Stebbins's relatives of his sickness, they would make it hot for them.

E. C. Williams testified that in a conversation with Leiman he asked him if Stebbins had made his will; that Leiman said, "I don't think he has, but we are going to get Mr. Hackney over there tomorrow to make the will."

W. C. Jacobs testified that he had a conversation with Leiman about the will, in which Leiman said to him, "We could have put this over if it hadn't been for that bunch over there sticking themselves in." Leiman denied all of these alleged statements, but his denial cannot be considered in determining whether or not such statements amount to substantial evidence of undue influence. If there had been any evidence that Leiman, either directly or indirectly, attempted to influence Stebbins as to the disposition of his property, then his alleged statements would become important. But in the absence of such evidence, these alleged statements have no evidentiary value on the question of undue influence. We repeat what we have heretofore said: "The undue influence which will break a will must be present in active exercise, and rise to the mark of such overpersuasion, coercion, force, fraud or deception, as breaks the will power of the testator and puts in its stead the will of another." The circumstances relied upon by appellants to show undue influence on the part of Leiman, do not measure up to this standard.

For the reasons stated the trial court was warranted in refusing to submit the issue of undue influence to the jury.

The judgment should be affirmed. It is so ordered. All concur.