ALBERT FESSLER, ROSA BOCKE, JOSEPHINE STEFFES, MARGARET OBER-
MANN and LÆNA GLADBACH, Appellants, v. ANTON C. FESSLER
and BENJAMIN J. FESSLER.—60 S. W. (2d) 17.

Division One, April 20, 1933.

*Roy McKittrick* and *Harry K. West* for appellants.

*Charles K. Hart* and *Franken & Timmons* for respondents.

HYDE, C.—This is a suit to set aside a deed to defendant Anton C. Fessler from his father, Jacob Fessler, who died June 20, 1929, eleven days after its execution. Plaintiffs are the brother and sisters of defendants. Plaintiffs' petition contained three counts. The first count alleged mental incapacity and undue influence; the second count alleged that the deed had never been delivered; and the third count was for partition of the land described in the deed. Defendant Anton C. Fessler's answer denied the mental incapacity and undue influence, alleged a valid delivery and alleged that he was the sole owner of the land. The answer of defendant Benjamin J. Fessler disclaimed all interest in the land and alleged that defendant Anton C. Fessler was the sole owner.

The evidence showed that Jacob Fessler had lived for many years near Wien, a German-Catholic community in the north part of Chariton County. He was a man of strong will and good judgment. He was successful as a farmer, and accumulated 625 acres of land, a considerable amount of money and other property. He had seven children, plaintiffs and defendants here, whose names and ages at

the time this suit was tried below were as follows: Anton C. Fessler, forty-seven; Rosa Bocke, forty-five; Margaret Obermann, forty-two.; Lena Gladbach, forty; Ben Fessler, thirty-eight; Josephine Steffes, thirty-six, and Albert Fessler, thirty-three. When they lived at home, all the children worked in the fields and did other farm work. When Anton (called Tony) was married his father bought a farm of 160 acres about two miles south of his home place and Tony went there to live. He continued to live there until his father's death and that farm is the subject of this suit. Jacob Fessler's wife died in 1918, and from that time until about a month before his death he continued to live on his 160-acre home place. Prior to her mother's death Rosa Bocke had married. She lived on her husband's farm in the same neighborhood. Josephine Steffes and Lena Gladbach were each married within about a year after their mother's death. They both lived within a few miles of their father's home. Ben Fessler was in the Army during the World War and when he returned made his home with his father until he was married in October, 1920. Ben then rented a farm near his father's place where he lived about four years. About 1924 or 1925 his father built a house for him on a 160-acre farm which he owned adjoining his home place. Ben lived there from that time until his father's death. His youngest son, Albert, and his daughter, Margaret, continued to live with Jacob Fessler. Albert was married in 1922, but he and his wife continued to live there until March, 1924. At that time there was some trouble between them and Ben and they rented a farm about eighteen miles away. Thereafter, they lived on rented farms, about that far away from the home of Jacob Fessler, until his death. Margaret Obermann was married in 1926 and lived at Bucklin, in Linn County.

For the last three years of his life, Jacob Fessler lived alone on his home place. He cooked his own meals and did his own housework. Occasionally some of his children came there and he visited their homes. Apparently the relation between Jacob Fessler and his children was friendly except with his oldest daughter, Rosa Bocke, and her husband. Bocke's farm joined Jacob Fessler's land and at first they exchanged work. Bocke was also a carpenter and at one time built a barn for Jacob Fessler. There was some disagreement about the amount of the bill for his work. During the last ten years of Jacob Fessler's life he did not exchange work with Bocke and did not go to his house, although the Bocke children did help him some in threshing and other farm work. There had also been some disagreement and ill feeling between Tony and the Bockes and Steffes.

Tony and Ben farmed with their father on the three Chariton County farms of 160 acres each. They helped with the work on the home place and he did some of the work on the places they occupied.

Jacob Fessler also owned a 145-acre farm in Macon County a mile north of his home place. This was rougher land and had no buildings except a barn. It seems to have been used by him mainly for meadow or pasture and they cut wood there. He kept cattle, hogs and sheep and most of his land was in grass, but he raised a few acres of corn each year. It was not shown what the arrangement between Ben and Tony and their father was. Ben attempted to testify that he rented the farm where he lived from his father, but, upon objection of plaintiffs' counsel, he was not permitted to relate the terms of the rental. It was shown, however, that Tony paid no rent and his father paid the taxes on the place he occupied but told Tony to do just as he wanted to there. It was also shown that Jacob Fessler kept some cattle there once and that Tony fed them. Plaintiffs claimed that Tony managed his father's business and therefore occupied a confidential relation toward him. Defendants, on the other hand, claimed that Jacob Fessler managed his own business, instructed Tony what to do and that Tony did as he told him. The evidence upon this issue will be hereinafter referred to in more detail.

Jacob Fessler began to fail in health in the spring of 1929. On the 5th of May he went to see Dr. West at New Cambria, who had been his family physician ''off and on'' for twenty-five years. Dr. West diagnosed his trouble as chronic indigestion and constipation and prescribed some medicine for him. About the 12th of May, Jacob Fessler commenced staying at Tony's. On May 15th, he went to Dr. Putman at Marceline. Dr. Putman had him come back on May 19th and kept him in the hospital until the next day when he made a thorough examination and found that ''his condition was due to enlarged prostate gland.'' He advised an operation. Some of the children did not favor this and Dr. Putman told them that their father would probably die from his condition unless something was done. Jacob Fessler, however, went back to Tony's without having an operation. Albert had advised his father to see Dr. Hawkinson of Roanoke, who called to see him on May 24th. Dr. Hawkinson made an examination and found the same condition as did Dr. Putman, but he advised against an operation because of his age. Jacob Fessler was almost seventy-nine years old at that time. However, he told him he thought he could give him some relief. Dr. Hawkinson came again on the 28th and 30th of May and on the 3rd, 6th, 9th and 13th of June. After June 13th, he did not see him again before his death on the 20th. Dr. West, however, called and saw him on the 15th of June, which was the last time any doctor saw him. The deed sought to be set aside was executed on June 9th. The testimony of both lay and medical witnesses as to the condition of Jacob Fessler during this time is sharply conflicting. The proper weight to be given the testimony produced by each side is decisive

of this case. We will therefore review first the evidence of the medical witnesses and then the lay witnesses' testimony.

Dr. West, who was plaintiffs' witness, testified that on June 15th Jacob Fessler "was in a comatose condition and was emaciated and very weak;" that he said something to his son but he could not understand what he said; that when he spoke to him he "worked his eyes and lips like he spoke;" that he thought he recognized him. Dr. West said: "He wasn't capable to transact any business that day." He further gave it as his opinion that from his condition on the 15th he "didn't think he was capable on the 9th of making any paper." He also said that "it wouldn't have surprised me if he had died that night; I didn't think he could live three days;" and that he told his son "I couldn't do him any good and didn't think any other doctor could." Dr. West was never directly asked whether he thought Jacob Fessler was of unsound mind when he saw him on the 15th.

Dr. Hawkinson, who was a witness for defendants, testified that Jacob Fessler's mental condition was all right; that he had some hardening of the arteries in addition to the condition caused by the enlarged prostate; that there was very little change when he made his second visit on the 28th; and that when he went back on the 30th he thought he was a little better. He said, however, that his condition was worse on the 3rd of June; that he told him he couldn't give him much encouragement and said to him: "If you have any business to attend to I believe if I was you I would do it;" that Jacob Fessler said he had been thinking about making a will; that he told him: " 'I believe if I was you I would do it.' He says, 'I was going to get the banker at Bucklin, he tends to all my business.' " After his visit on the 6th, Dr. Hawkinson told Josephine Steffes "he was in awful bad shape and I didn't expect him to live." He said that he asked Jacob Fessler on that day if he had fixed up his papers and he said he had not; that "he roused from that condition;" that he saw him again on June 9th about ten o'clock; that his condition on that day was pretty good; that he got up without assistance; and that Jacob Fessler asked him at that time what his bill was and, when told it was ninety dollars, signed a check which Tony wrote for that amount. He further testified that the last time he saw him was the 13th; that he was so much better that day he didn't do anything, and that Jacob Fessler said, "I am doing so well you needn't come back Sunday unless we call you." Dr. Hawkinson also testified that Jacob Fessler was of sound mind on the 9th, and that his mind was all right every time he saw him. He said that Jacob Fessler never at any time had any fever; that the condition from which he suffered "don't affect a man's mind until he gets in that comatose condition;" that he had no uremic poison

or retention of urine (sufficient to cause stupor); and that he never was in a comatose condition while he was there. He said that Jacob Fessler spoke in a low tone but he "could understand without trouble sitting beside him;" and that "he answered every question perfectly rationally."

Defendants also called Dr. Putman as a witness. He testified as follows about the condition with which Jacob Fessler was afflicted:

"Doctor, does an enlarged prostate itself cause death or cause something else which produces death? A. It causes something else that produces death. . . . Q. What would he die of? A. Those cases die from nephritis or uremia. Q. What's the difference between uremia and nephritis? A. Uremia is one of the symptoms of nephritis. Q. Does that have any effect on the brain? A. In what way? Q. Does it impair the functions of the brain for reasoning? A. Uremia, after they go into coma or convulsion, it certainly does. Q. Does it before that time? A. Ordinarily the mind is clear. Q. Does it sometimes affect the mind? A. Not ordinarily; not until they have either coma or convulsion. . . . Q. He was suffering from pains in the stomach? A. In the abdomen, not the stomach. Q. The lower abdomen? A. Yes. Q. That was caused by the prostate gland? A. It was caused by a distended bladder. . . . The distention of the bladder causes pain. Q. Yes? A. He has to void some way; when he was at the hospital he was voiding some; if the bladder was overflowing it wasn't damming up in the kidneys. The kidneys were not damaged when I saw him. Q. With that condition would it damage the kidneys? A. We expect it to. Q. How long would it take? It might take a few days or several months? A. That depends on how much escapes from the bladder. Q. Suppose there was an entire stoppage of the urine what would happen? A. Death would result in a few days' time without relief. Q. Doctor, uremia itself is the excess of the urea in the blood over the normal amount? A. Yes. Q. That's what uremic poison is? A. Yes. Q. And it begins to act on the brain? When that poison is there it acts on the brain until it finally results in coma or convulsion? A. It wouldn't act on the brain first. Q. How would it act? A. The first symptom is weakness, rapid pulse and shortage breath. Those are the things the patient first notices. Q. Doctor, what does nephritis do to the brain? What is that? A. Nephritis is a disease of the kidneys frequently spoken of as Brights disease; there are several kinds of that. Q. How does that affect the brain? A. It may not affect the brain at all, but there is a certain form of mania that becomes nephritis occasionally. . . . Q. Explain to the court whether delirium is a result of uremia. Does uremia usually cause delirium? A. Not very often. Q. Explain to the court just

what the effect of uremia is in its final stage? A. Death. Q. I
mean how long before that the symptoms appear, shortly before
death? Two or three days before death? A. They can have a small
amount of uremia and continue over a long period of time, even
continue active work in business and still be uremic; but if the
poison still continues progressively there comes a time when they
can't carry on business. Q. What symptoms occur before that?
A. If the poison increases? Q. Yes. A. The patient would ordinarily
begin to complain of shortness of breath and headache and weakness
and vomiting and become confined to the bed. Q. Until just the
time when the condition has reached a sufficient stage to cause coma
or convulsions, does it affect the general condition of the mind? A.
Ordinarily not.''

A hypothetical question was propounded to Dr. Putman based on
the evidence of defendants concerning Jacob Fessler's condition
and the developments in his case after he had examined him on May
20th, and he was asked to say whether or not Jacob Fessler was
of sound mind on June 9th, when the deed in question was executed.
Dr. Putman's answer was: ''I would give it as my opinion that
he was of sound mind.''

Plaintiffs, in rebuttal, called Dr. Ralph Fellows of Salisbury. He
had never examined Jacob Fessler but testified concerning his trouble
as follows:

''Q. What is uremia, doctor? A. Uremia is intoxication from re-
tention produced from proteuria metabolism. Uremia is caused, as
much as any of us know about it, any medical science, uremia is
caused primarily from retention of urea in the blood. . . . Q.
Doctor, would a content of urea in the blood in excess of the normal
amount cause by enlargement of the prostate affect the brain and
mental capacity prior to the time the patient went into a comatose
condition? A. My answer is yes. May I explain the answer further?
Prior to the time they began examining the blood for urea content
of the blood a person was ordinarily unable to tell whether they had
uremia before they went into uremic coma, but now we know they
have uremia before they go into uremic coma.''

In answer to a hypothetical question based upon plaintiffs' evidence
calling for his opinion as to the mental capacity of Jacob Fessler
on June 9th, Dr. Fellows answered:

''A. Well, my answer would be that any individual in such a
weakened physical condition as described would be unable and in-
capable of any extensive and intensive reasoning or constructive
thinking; he would be unable to concentrate his attention for any
extended period of time.''

Upon cross-examination he further explained his answer as follows:

''Q. Doctor, do I understand you to say that a man who is physical-

ly weak is mentally incompetent? A. No, my idea that I intended to convey was that a man that was so weak physically and had all the physical impairment that was described in the question asked me, a man in that condition would have impairment of the heart and impairment of the kidneys and muscles of the legs, and I can't see how he could have all those impairments without having some mental impairment. Q. According, then, to your last answer, you are taking into consideration the elements stated by Mr. West in his hypothetical question? A. I believe I could go far enough to say any individual who had as much physical impairment as described in the question would have some mental impairment. Q. You can't say how much? A. I don't say what the probable impairment would be.''

The evidence of the lay witnesses was even more conflicting than that of the doctors. Jacob Fessler's brother, William Fessler, who lived in the same neighborhood, died on June 3rd, and his funeral was on June 6th. On June 5th Mrs. Louise Rupp, a sister of Jacob and William Fessler, came to attend the funeral of William Fessler. After the funeral she stayed at Tony's and helped take care of Jacob Fessler until Wednesday, June 12th, when she returned to her home in Quincy, Illinois. She testified that on previous visits Tony had asked her to persuade his father to make a will but that he always said ''no, there is plenty there for all, they all get plenty.'' She said that after William Fessler's funeral, pursuant to the further request of Tony and his wife, she suggested to Jacob Fessler again that he make a will and received the same answer. At her request, a priest came on the day William Fessler was buried and heard Jacob Fessler's confession, gave him extreme unction and came back the next morning (Friday, June 7th) and brought him the sacrament. Mrs. Rupp testified that Jacob Fessler, on that day, was ''a very, very sick man, he was delirious, he got out of bed and was lying on the floor.'' She said that she and Tony's wife picked him up. She testified that on Sunday, June 9th, Tony's wife said ''this is the day he should make his will;'' that Ben took her to church; that when they left Mrs. Tony Fessler said to Ben ''he didn't do anything yet;'' and that Ben answered, ''go for him.'' She said that that afternoon Jacob Fessler asked her to call Ben; that, when he came in at her request, Jacob Fessler said to him, ''Well, if I should make that get a pencil and paper,'' but Tony, who had also come into the room, said ''you can't make that, there would have to be a notary public do that, otherwise it wouldn't be legal.'' She said that while Ben went after someone ''Tone stayed there and Tone was telling his father how to make the will and what to do . . . Tone said 'don't give me this because I don't want to move;' '' that Tony and his father talked about what to give Ben and the

others and that finally she said "Jake, don't you want to give anything to the church for masses, and he answered 'five hundred dollars;'" that Tony asked him if he wanted to give anything to Father Vonderstein's church; and that he said "give him two hundred dollars to that church for masses." She said that Tony then had Jacob Fessler sign a blank check; that she called his attention to the fact that it was not filled out and he gave her a cross, angry look and said "I can do that any time;" and that he then made out another check for $200 and had his father sign it.

Ben returned with Mr. Rouse, cashier of the Bucklin Bank, who wrote Jacob Fessler's will and the deed, sought to be set aside in this action, from Jacob Fessler conveying to Tony the 160-acre farm where he lived, and also another deed conveying Jacob Fessler's 160-acre home place to Ben. The will was dated and the deeds shown to be acknowledged June 8th. Mrs. Rupp said Tony said "Don't date it on Sunday it won't be legal, date it back on Saturday." Mrs. Rupp further testified concerning Jacob Fessler's condition the next day: "He was awful delirious Monday afternoon, he was terrible." She said: "The doctor was there and left some medicine there that if he would get up very delirious and high feverish to give him that and it would quiet him, and they gave him that every time he would get those delirious spells and he would quiet down." (There was conflicting evidence as to the effect of his medicine upon the mind.)

All of Jacob Fessler's daughters and their husbands and Albert Fessler and his wife testified concerning their father's condition at various times during June, when they visited him at Tony's, and all expressed the opinion that he was mentally unsound on June 9th. Mrs. Steffes described his condition on June 8th as follows:

"He was the picture of a skeleton, very near. His eyes were sunken way to his head. His arms were just hide and bones. I looked over him and his vertebrae was just one mass of bones as far as I could see. His feet were cold. They had him packed in hot water bottles and wrapped in woolen blankets."

Mrs. Gladbach visited him on June 6th and 8th. She said: "He had no strength hardly whatever. His flesh . . . he was a skeleton, and his voice . . . you would have to get right up to the bed to hear what he was telling."

Mr. Gladbach testified that: "On the night of the 8th when I come in there to look at him he laid there and looked like to me just like as if he was dead. That's what he looked like to me."

Mrs. Obermann visited him on June 6th and 13th. She said that on June 6th: "When I came in I said, 'Hello, dad,' and he didn't answer. I took the chair and sat beside the bed. He made signs of getting up and I assisted him in getting up and helped on the

vessel. I then helped him back to bed, and he moaned when I put him in bed and grabbed for his stomach.'' And that on June 13th: ''We came in and he looked scared and frightened. When I said, 'Hello, dad,' his eyes became dilated. I said 'Are you feeling better?' and he shook his head.''

Mrs. Bocke was there June 7th, 9th, 11th and 12th. She said that on the 9th: ''I went up first to the bed and took hold of his hand and shook his hand and said, 'Hello, dad, how are you?' but he never moved. . . . You couldn't make out what he was saying, he just kind of whispered, I didn't know what he said, I couldn't make out anything.''

Albert Fessler said that on June 6th ''he was awful thin and pale and he just looked like a dying man.''

Defendants, in addition to their own family testimony (hereinafter referred to) that Jacob Fessler was of sound mind on June 9th and after that date, produced the testimony of several neighbors to the same effect. M. J. Rogers saw him ten days before he died and shaved him on the Saturday evening before he died, which was June 15th. He said that Jacob Fessler greeted him by saying, ''Hello, Mike;'' that he asked whether he wanted him to ''sit up or lay down;'' that he changed positions without assistance; and that he said when he finished ''that feels better.'' Rogers said he was of sound mind that day. John Kunkel said that he visited him just after William Fessler's death and that he had as good a mind as he ever had. Oscar Miller said he saw him and conversed with him on the Saturday and Monday before he died and that his mind was sound. Anton Noll and Frank Reichle, who witnessed his will on the 9th, also testified to talking to Jacob Fessler then and expressed the opinion that he was of sound mind on that date. Mr. Noll and Father Vonderstein, the former priest at Wien, testified that Jacob Fessler had told them years prior to his sickness that he was going to give Tony a farm.

Mr. Rouse, who made the deeds and the will was the cashier of the Bucklin Bank where Jacob Fessler did most of his banking business. He said that he was in the room alone with Jacob Fessler and that:

''He said he wanted some papers made out, and I asked him what kind of papers he wanted, and he said a couple of deeds and a will, and I asked him who he wanted the deeds to, and he said Tony and Ben. . . . Q. Well, did he talk to you about the will? A. Well, he said he didn't want these deeds he was making to Tony and Ben to count against them in the will. Q. Did he name the children to you? A. Yes, named the children. Q. What did he say about the property? A. Said he wanted to give Mrs. Bocke just fifteen hundred dollars interest in the real estate, but he wanted Mrs. Obermann

and Mrs. Gladbach to have one thousand dollars more than an equal part. . . . He said anything else he had than real estate when he died he wanted that to go equally to the children. I asked him and told him we would have to have some kind of descriptions of the land either from old deeds or the abstracts, and he said they would get me the deeds. . . . I asked him who he got these different pieces of land from and he said he got the 'home place' from Bartletts and the other place from Eichman or Eickleman, or something like that, I don't know how you pronounce it. . . . Mr. Fessler was weak; his voice was clear and distinct, possibly a little lower than usual. . . . I never saw anything wrong with his mind not even enough to cause me to think there was anything wrong with him.''

Mr. Rouse said that, after Jacob Fessler told him what he wanted, he wrote out the will on the dining room table with a pencil; that they then ate supper after which he went upstairs and wrote the deeds and the will on a typewriter which he had brought with him; that he read the descriptions in the deeds and read the will to Jacob Fessler and he said ''all right'' and signed them; that the papers were put on a chair by the side of his bed and Jacob Fessler sat up on the side of the bed, without assistance, with his feet on the floor, to sign them; and that he then directed him to take the will to the bank and to record the deeds. Mr. Rouse also said that Jacob Fessler told him that ''he wanted to give Ben and Tony this land because they had been good to him.'' Plaintiffs attempted to show some attempt at secrecy about Mr. Rouse's trip and that his car was concealed while he was at Tony's. However, he mailed the deeds to the recorder the next day and they were recorded June 11th. Some of plaintiffs at least knew at once that the deeds had been made. John Steffes said he heard about it the next morning and that on Friday he got a Salisbury paper which showed they had been recorded.

Ben and his wife and Tony's wife testified in substance that during the first week Jacob Fessler was at Tony's home he looked after his own work on the home place and he only stayed there at nights, but that during the second week ''he was up and down, laid down sometimes, then he walked around outside some.'' That was during May. About the last of the month ''he took down in bed; that during the first week of June he could get up and sit in a rocker and during the second week of June ''he could still sit up in the rocker and was always able to get up by himself;'' that the last time he got up without assistance was the Sunday before he died, which was a week after the deeds and will were made; and that he was of sound mind all the time unless it was the last two or three days when they ''couldn't make out his speech'' and during which time he was unable

to get out of bed. Tony Fessler did not testify and plaintiffs say that this should raise an unfavorable presumption. Defendants, however, point out that he was disqualified under the statute from testifying about the transaction with his deceased father and say that his testimony was not offered for that reason. There is much in the record about an alleged further gift of a $6,000 certificate of deposit of the Bucklin Bank to Tony, which it was claimed that Jacob Fessler indorsed and delivered to him on June 12th, after Mrs. Rupp left on that day. It appears that there is other litigation pending about that matter. The case does not necessarily settle that.

Plaintiffs contend that a confidential relation existed between Tony and his father which cast the burden of proof upon him to show that the conveyance was not the result of undue influence. The evidence upon this proposition was also conflicting. It seems, however, apparent that when Jacob Fessler was in good health that he was a man of decided convictions, who managed his own business, and that all of his family respected him and did as he said. Plaintiffs had evidence to show that during his declining years he was aided more by Tony than anyone else in the family. He could not read or write English except to sign his name, and always took a German newspaper. He would have Tony write out registration papers for his cattle and hogs. Tony would also write checks for him to sign and sometimes took his book to the bank to be balanced. He would consult Tony and Ben about selling and buying stock. Tony and Ben had automobiles and they often took him to town, to fairs, to sales and to picnics. They assisted him in his farm work and at his request looked after getting trucks to haul his stock and wool to market and to get material hauled to his farm. Jacob Fessler was a road overseer and Tony collected some road taxes for him and, at least once, took his books to the township board to make his settlement. Defendants' evidence, however, tended to show that Jacob Fessler still managed his business according to his own ideas and that Tony and Ben merely ran errands for him, took him where he wanted to go and did what he desired them to do. Plaintiffs' evidence on this issue is not very convincing that Tony, or both boys together, directed the course of their father's affairs or managed and controlled his business. It is worthy of note that Jacob Fessler did, until the last few weeks of his life, live on his own farm alone; that he often went to town and other places by himself on horse back and in his buggy, and that he took an active interest not only in his own business but in the affairs of the community as well. He was, of course, dependent upon Tony for his care during his last illness, and Tony and Ben, as he got worse, slept with him at night at his request; but even then, according to Ben's testimony, he directed him about the work to be done on his home place and how to take care of his stock there.

■ The court found for defendants on all counts, dismissed the first two counts of plaintiffs' bill and found on the third count that Anton C. Fessler was the sole owner of the land conveyed by the deed sought to be set aside in this action. Plaintiffs have appealed from this decree. Whether the court found there was no confidential relation or whether it found that there was such a relation and that the defendants sustained the burden of proof, is not indicated. We think there was ample evidence to sustain the court's decree on either theory. This court fully discussed the rule of confidential relation recently in Manahan v. Manahan, 52 S. W. (2d) 825; Patton v. Shelton, 328 Mo. 631, 40 S. W. (2d) 706; Klaber v. Unity School of Christianity, 330 Mo. 854, 51 S. W. (2d) 30; and Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772. In the latter case this court, after reviewing the authorities, concluded: "It is not the rule in this State that a mere confidential relation raises a presumption of undue influence," and there held that to raise the presumption there must be sufficient other facts and circumstances.

■■ We have carefully reviewed the long record in this case and have attempted to summarize and set out the evidence most favorable to the contentions of each side. It would require twice as long a statement to relate all the details of the matters about which evidence was produced. Plaintiffs contend that the evidence clearly shows that the mental and physical condition of Jacob Fessler on June 9th was such that he was incapable of making a will or a deed, and that the only reasonable conclusion from the evidence is that the deed in question here was obtained by undue influence. Defendants, on the other hand, contend that the great weight of evidence is that defendants used no influence at all; that the deed in question here was Jacob Fessler's own voluntary act; and that he was mentally competent to make it. The legal principles applicable are. well settled and have been often stated by this court. We recently restated them in Manahan v. Manahan, 52 S. W. (2d) 825, as follows:

"It is not necessary that undue influence be proven by direct evidence. It may be shown by or inferred from the facts and circumstances in evidence. [Webster v. Leiman, 328 Mo. 1232, 44 S. W. (2d) 40; Gott v. Dennis, 296 Mo. 66, 246 S. W. 218; Coldwell v. Coldwell (Mo.), 228 S. W. 95; Grundmann v. Wilde, 255 Mo. 109, 164 S. W. 200; Lindsey v. Stephens, 229 Mo. 600, 129 S. W. 641; Mowry v. Norman, 204 Mo. 173, 103 S. W. 15.] But 'such facts and circumstances must from their nature, at least, savor of some act which by reasonable construction may be held to indicate a purpose on the part of the proponent to gain some advantage . . . which would redound to her own pecuniary benefit.' [Bushman v. Barlow, 316 Mo. 916, 292 S. W. 1039, 1051.] 'It must not rest on mere opportunity to influence, or on mere suspicion. There must be somewhere proof

of undue influence itself, either in fact or presumptively. . . . It must not be merely the influence of natural affection.' [Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46, 51.] The undue influence must 'rise to the mark of such overpersuasion, coercion, force . . . or deception, as breaks the will power of testator and puts in its stead the will of another.' [Webster v. Leiman, 328 Mo. 1232, 44 S. W. (2d) l. c. 43.]''

Likewise, in Beckmann v. Beckmann, 331 Mo. 133, 52 S. W. (2d) 818, l. c. 823, we restated the same principles and further said:

■ ''But the law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved or trusted by testator.''

Since this is an action in equity the case is heard here *de novo* and and this court passes upon the weight of the evidence. However, where there is conflicting verbal testimony, involving credibility of witnesses who have appeared before the chancellor, this court will usually defer to his findings unless satisfied that they are against the weight of the evidence. [Manahan v. Manahan, 52 S. W. (2d) 825; Scott v. Hill, 50 S. W. (2d) 110; Norton v. Norton, 43 S. W. (2d) 1024; Pfotenhauer v. Ridgway, 307 Mo. 529, 271 S. W. 50.]

■ As the above statement of the facts shows, the evidence here was irreconcilable. If all of plaintiffs' evidence was to be believed and defendants' evidence disregarded, a finding of either mental incapacity and undue influence would be justified. On the other hand, defendants had ample evidence to sustain the finding of the chancellor. Since the able chancellor who heard this case had the advantage (we do not have) of having before him, where he could observe their attitude and demeanor, the lay witnesses (most of whom were interested), when they explained their acts and feelings and described the physical and mental condition of Jacob Fessler in his last illness and the surrounding circumstances thereof; and since he likewise had before him, so as to be better able than we are to judge their sincerity and the probative force of their testimony, the medical witnesses (whose evidence seems, on the cold record, to be more in favor of defendants on the issue of mental capacity), we do not feel justified in reaching a different conclusion.

The judgment is therefore affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All of the judges concur, except *Hays, J.,* not voting because not a member of the court when cause was submitted.