LEWIS HEDRICK, and LEWIS HEDRICK, Administrator of the Estate of EMMA HEDRICK KELSEY, PHILLIP HEDRICK and HAROLD HEDRICK, Appellants, v. WILLIAM HEDRICK, MARIE ZIMMERMAN, and ARTHUR HEDRICK.—No. 38169.—168 S. W. (2d) 69.

Division One, February 2, 1943.

*R. A. Mooneyham* for appellants.

*Ben F. York* and *R. E. Kleinschmidt* for respondents.

 BRADLEY, C.—Action to set aside a deed to 160 acres of land in Jasper County. The deed reserved a life estate in the grantor. The trial court found for defendants, and plaintiffs appealed.

Defendants have filed a motion to dismiss the appeal. In the motion it is alleged that plaintiffs (appellants) have failed to comply with rules 7, 13 and 15 of this court. Rule 7 pertains only to bills of

exceptions and, among other things, provides that "in equity cases the entire evidence shall be embodied in the bill of exceptions." Rule 13 deals with both law and equity cases, provides what abstracts shall contain, and requires that the abstract "shall set forth so much of the record as is necessary to a complete understanding of all the questions presented for decision", and that "the evidence of witnesses may be in narrative form except when the questions and answers are necessary to a complete understanding of the testimony." Rule 15 deals with briefs, and among other things, provides that the appellant's brief shall contain "a fair and concise statement of the facts of the case without reiteration, statements of law or argument", and the rule requires "a statement, in numerical order, of the points relied on with citation of authorities thereunder."

Appellants' abstract is, we think, sufficient for us to understand "all the questions presented for decision", as required by rule 13, and is a substantial compliance with the rules. It is contended that appellants' statement is argumentative and unfair. The statement may not be letter perfect, when measured by rule 15, few are, but it is not such, in our opinion, as to justify the harsh penalty of dismissing the appeal. The motion to dismiss is overruled.

Four grounds for setting aside the deed are alleged, viz.: (1) Mental and physical weakness of the grantor; (2) confidential and fiduciary relation between the grantor and Marie Zimmerman, one of the grantees; (3) undue influence on the part of grantee Marie Zimmerman; and (4) lack of consideration. Defendants answered jointly by a general denial. There is no claim that any money consideration was paid by defendants. The deed was one of gift, hence the question of consideration is not involved.

The grantor's husband, Dr. Dana Kelsey, died in 1901, and she then became, or was then the owner of the land involved, and other land, in all, 460 acres in Jasper County. After her husband's death, the grantor lived on the land until 1913, when she went to Los Angeles, and remained in California until her death, November 12, 1938, except a month's visit to Jasper County in 1920. Grantor, on March 1, 1914, leased the land to plaintiff, Lewis Hedrick, for 4 years, and March 1, 1918, a new lease was executed for the 460 acres for another 4 years. In 1918, plaintiff Lewis Hedrick purchased 140 acres of the land, and in 1920, he purchased 120 acres, and he continued in possession, as lessee, of the remaining 200 acres until the death of Mrs. Kelsey.

At the time of her death, Mrs. Kelsey was 92 years old. The deed was executed in Los Angeles on July 29, 1937. Defendant Marie Zimmerman resided in St. Louis, Missouri. In July, 1937, Mrs. Zimmerman, her daughter, Helen, and a Mrs. Scott, Belleville, Illinois, visited Mrs. Kelsey in Los Angeles, and it was on this visit that the deed was executed. Plaintiffs used, by deposition, witnesses who had known Mrs. Kelsey for various periods ranging, as to some witnesses,

over a period of several years. A composite statement of the evidence of these witnesses as to Mrs. Kelsey's mental condition for the 3 or 4 years prior to the execution of the deed and at the time of execution, and of other pertinent facts, may be given about as follows:

She didn't seem to know how to manipulate the night latch on her door; did not always shut off the gas stove in her room as she should; for periods she seldom went out of her room; had poor memory and had to be told what to do; was not able to remember people whom she saw frequently; her mind seemed to wander; would ask same question at short intervals; in mind she was comparable to a child; used too much salt on her food; refused to eat sometimes; would lock herself out of her room; refused to sit at the table with a woman roomer of the same court (boarding house) because, she said, the roomer was too ugly, and would not sit in the rocking chair where the ugly woman sat, but sat in it after it was washed; was easily confused; did not seem to understand and remember that her bank account would be reduced if she drew checks on it; subsequent to Mrs. Zimmerman's visit in July, 1937, Mrs. Kelsey called her landlady Marie, when her name was Grace; she needed attention, but didn't want it; she locked herself in her room and couldn't unlock the door and pushed the key under the door so door could be unlocked; would do without needed food so she could buy face cream and face powder and wash her hair with grapefruit juice and egg; wouldn't permit the removal from her room of fruit peelings upon which there were ants; said the husband of her landlady was crazy because he did not agree with her (Mrs. Kelsey); she addressed letters to herself which were to others; misdirected her letters; got them in the wrong envelopes; didn't know directions where she lived; would get lost; would wear a sweater and bathrobe in hot weather; thought that the man who was to paint her house (in San Pedro, California) should furnish the paint; said that the bank where she had done business for years was not the bank where she did business; became confused as to her bank account and said she was robbed; she wore carrot and beet tops as bouquets; the missionary society met at the court where Mrs. Kelsey roomed, and she said "they were the screwiest looking bunch of women she ever saw"; she was close, stingy and pretended to have no money.

At the time of defendant Marie Zimmerman's visit in July, 1937, when the deed was executed, Mrs. Kelsey was living in one of the cottages of the court owned by Grace Suter and her husband, and Mrs. Zimmerman rented one of the cottages for her party (herself, daughter and Mrs. Scott). During the period of the visit a lawyer who had represented Mrs. Kelsey, called to see her, and Mrs. Zimmerman refused to permit him to see her. And on this visit Mrs. Zimmerman bought for Mrs. Kelsey "a little voile dress; made it for her; fixed her hair; and bought several little items, fancy collars and pins, and Mrs. Kelsey, like a child, was delighted. She bought

her whipped cream and candy. This pleased Mrs. Kelsey very much.'' Mrs. Suter said that Mrs. Zimmerman, as soon as she came to the court, ''took Mrs. Kelsey in her hands''; that Mrs. Zimmerman and her daughter bought Mrs. Kelsey ''lots of presents and were very lovely to her''; that one evening (data for preparation of the deed was taken by a lawyer on this evening) ''we (Suters) were going out'', but Mrs. Zimmerman did not go; ''said they were to have company''; that on this evening she (Mrs. Zimmerman) took Mrs. Kelsey over to the ██ cottage occupied by Mrs. Zimmerman; that she (Mrs. Suter) saw the lawyer there.

The deed was prepared and sent to Mrs. Kelsey a few days before its execution. It was signed and acknowledged on July 29, 1937, as stated, and Mrs. Zimmerman, her daughter Helen, and Mrs. Scott left the next day. Mrs. Suter testified that ''they hadn't been gone two hours'' before a post card came for Mrs. Zimmerman from her daughter Ruth, in St. Louis, and that on the post card was this: ''Mother, we are getting along fine. I hope you accomplished what you went out to do. If you haven't, stay until you do.'' And it appears from the evidence of the notary, Stephen M. Kester, who took the acknowledgment to the deed, and who was defendants'. witness, that he got the impression that Mrs. Scott, who came with the Zimmermans from St. Louis, ''was living in Los Angeles at the time and had charge of the courts (the cottages) either with Mrs. Zimmerman or Mrs. Kelsey.'' When Kester arrived to take the acknowledgment he ''asked for a witness to swear to the identity of Mrs. Kelsey'', and it is not clear, but we infer that Mrs. Scott did so, and we infer that Kester got the impression as to who owned the cottages while endeavoring to identify Mrs. Kelsey.

Some of plaintiffs' witnesses gave it as their opinion that Mrs. Kelsey's mind was unsound, and that she was not capable of transacting business, and such was the opinion of Mr. and Mrs. Suter on the day the deed was executed. Also, it appears that quite a few times Mrs. Kelsey, without naming any one, said that her relatives would get her property when she died. And, on occasions, after the deed was executed, Mrs. Kelsey spoke of owning the land. And, after the execution of the deed, she spoke of plaintiff Lewis Hedrick as a ''wonderful person'', and said that she ''was very fond of him.''

Defendants' evidence follows: In addition to the evidence, supra, of the notary, Kester, he testified that ''they (no one named) either phoned or came'' to his house and asked him to take the acknowledgment ''as soon as possible'', and that he didn't get home that night until after dark, and that when he arrived to take the acknowledgment Mrs. Zimmerman ''explained that her train was leaving (she did not leave till next day) and she was all packed up and she was leaving for St. Louis''; that all seemed to be disturbed ''that I might not get there in time''; that he said very little to Mrs. Kelsey; that he ''asked if she was willing to sign the deed as drawn up and she

said she was, and signed it"; that he "saw nothing to indicate her mind was not clear or rational."

Milton E. Grammes, a retired railroad man, testified that he had known Mrs. Kelsey for 10 years; that for the last three years of her life he had charge of her property in San Pedro, corresponded with her, sent her a monthly check; that she "looked after her business affairs" except the last six months; that she carried on a rational conversation; that she was eccentric, but he thought she had a good mind for her age.

Gerald Bridges, an attorney, testified that he drew the deed in question; that early in 1937 he was asked "by a Mrs. Zimmerman" to call on Mrs. Kelsey; that he "told her (Mrs. Kelsey) he had been asked to call" and that she said she would get in touch with him later; that later, at the request of Mrs. Zimmerman, he went one evening to see Mrs. Kelsey; met Mrs. Kelsey and two other people; had some conversation, and all the people left the room except Mrs. Kelsey and himself; that he and Mrs. Kelsey discussed her property and "eventually she decided to make a conveyance of the property in Missouri"; that he told her "about the expense of probate and inheritance taxes, and about the conveyance of the property in Jasper County to the three people named in the deed, reserving to herself a life estate"; that she had a deed or some other document from which he took the description; that after the conference he returned to his office, prepared the deed that night and mailed with instructions to sign and acknowledge before a notary; that their conversation lasted possibly two hours. "I believe she was of sound mind, she explained about the nature of oil leases and interest in Texas with a continuity of mental direction and explanation that showed she was aware of her interests and of the transaction she was carrying out. She struck me as being almost 80 years."

On cross-examination Bridges testified: "I talked with Mrs. Kelsey the week following Mrs. Zimmerman's visit at the office. Mrs. Zimmerman was present and another lady whose name I do not recall when I called at the house. Mrs. Zimmerman led the conversation at the outset, after they left the room Mrs. Kelsey and █ I had our conversation. On two occasions Mrs. Kelsey called Mrs. Zimmerman in and asked some questions about various things. One thing was about a beneficial trust in a Long Beach bank. I got the impression that the land, other than the Jasper County land, had no income and the value unknown. I did not believe her oil interests were worth much. Mrs. Zimmerman told me Mrs. Kelsey was expecting me and she was prepared and had her papers there. Mrs. Zimmerman paid me for preparing the deed."

Helen Zimmerman, age 32, and employed in the St. Louis public library, and a daughter of defendant Marie Zimmerman, testified that she was in the cottage on the night when the deed was executed; that after Bridges came she left the room; and remained out until

shortly before he left; that her mother was in and out; that "we were there 10 days before a discussion of the property came up", and that Mrs. Kelsey began the discussion; that Mrs. Kelsey said that "she wished to make a deed to my mother and her two brothers and settle it before we left"; that a few days thereafter Mrs. Kelsey "talked to me alone"; said that she "wanted to make my mother and her two brothers happy; that she had given to Lewis all that she intended to give him." And this witness testified that she thought Mrs. Kelsey "was sane and capable of transacting business."

Defendants introduced 28 letters written by Mrs. Kelsey to defendant Marie Zimmerman over the period from February 2, 1936, to November 10, 1938. These letters are generally well written and certainly reflect a fairly good mind. The composition, spelling and punctuation are fairly good. It is suggested that she may have had help in writing these letters, but there is no evidence of such. It is quite clear from these letters that she did not intend for plaintiff Lewis Hedrick to receive any of her property, and in neither of the letters did she mention plaintiffs Phillip and Harold Hedrick. We set out excerpts from these letters:

February 18, 1936: "I just had a letter from Will (defendant William Hedrick) telling me about his afflictions. This is why I am anxious to help the poor boy. Lewis (plaintiff Lewis Hedrick) wants my 160 acres, but wants it for a very little, now don't let him know what I say. It is best to keep on his best side. . . . Whisper to Arthur I want him to be a good boy."

April 4, 1936: "I just have another letter from Lewis. He wants to pay me so much as long as I live and then own all my land there. I have treated him that way once and know he has his share of my property. Don't tell any one that I have mentioned this to you. He is anxious to have my land that is there. He has had his share. If he new I had told this to anyone he would never get over it. Be careful and don't tell or let anyone see this letter he would be so mad he would not treat me right. He has always bin good to me. I want no change."

April 5, 1936: "Your letter came today. Your advise is mostly good. Just what I tell you now I want you to keep it to yourself. I never intended to give Lewis any more. I have given him too much already. He is always trying for more. If he accepts my offer I will be so glad. I made this proposition to him. Pay me a good sum annually and farm it as he pleases. Just as soon as I have plenty to live on here I intend to have three deeds made of the 188 acres, to Marie, Arthor, and Will. I know you each need it and hope you will make the best use of it possible. Sell it or have it farmed just as you think best. I don't intend to leave anything for anyone after I am gone. . . . Now don't tell any one what is in this letter. Burn it as soon as you read it. . . . When you can try and show Will

what is best for him to do. I think he hardly knows at any time what to do. I feel so sorry for him.''

May 3, 1936: ''I don't want Lewis to know I was anxious to hear from my land its prospects. I let him have the 120 acres for a small sum. He got a big share of my land. Has enough to make them plenty all their days. I don't dare to let him know I say this.''

July 26, 1936: ''He (Lewis) is now beging me to sell my farm to him just about like I did the 120 acres. If I could get him to do the way with you Arthor and Will I would let him have it. He makes me a nice sum my life time and then has it for his own. This is the second time he has urged me. Now please don't tell any one. I would not have any one to know it. You may talk to Arthor about it but must not tell any one else.''

May 9, 1937: ''Lewis has offered to by my land so often for I think nothing. Now how would this do, you and Arthor tell him you will buy it if he will still rent it as he does and pay the money he makes on the place to me for the interest you would owe me each year. Now I would not let him know I had said this to you. He would be so mad and feel like doing nothing for me. It would be a good way to get it out of my hands and you look after it and see that I get all that is coming to me.''

June 7, 1937: ''I never told Lewis you wanted to bye my farm. I have told you that Lewis wanted me to give him mine. He would buy it if the price would be very small. May (Lewis's wife, we infer) says they are going to have all I own. She is very much misstaken. I would not have you or any one to tell her so. I need my money my life time. Have never given her any reason why she would get it any time.

''It is not good for any of you to talk to Lewis about my land. He does want it badley. I have told him how I wished he could sell it for me at $100 per acre. He has made no reply to it. He is very slow about answering my letters. Poor Will, I feel so sorry for him. He is mistreated. He don't do what is best for him.''

 The cancellation of a deed is the exercise ''of the most extraordinary power of a court of equity, which ought not be exercised except in a clear case'', Lastofka et al. v. Lastofka, 339 Mo. 770, 99 S. W. (2d) 46, l. c. 54, and the evidence to justify cancellation should be clear, cogent, and convincing. Bross et al. v. Rogers et al. (Mo. Sup.), 187 S. W. 38. In Stubblefield v. Husband, 341 Mo. 38, 106 S. W. (2d) 419, l. c. 423, it is said that to justify cancellation of a deed on the grounds of mistake or fraud, the evidence ''must go beyond a mere preponderance of the testimony and remove all reasonable doubt.''

 Was Mrs. Kelsey mentally incompetent to execute the deed? Plaintiffs, in the brief, say that Mrs. Kelsey ''was more than 90 years of age at the time the deed was signed; that she was feeble and infirm physically and mentally'', and as appears, some of plaintiffs' wit-

nesses testified that in their opinion, Mrs. Kelsey's mind was unsound prior to and at the time of the execution of the deed.

On the other hand the letters introduced by defendants reflect that Mrs. Kelsey was fairly mentally alert. And it will be observed that two of these letters were written shortly prior to the execution of the deed. And, among these letters, is one (not quoted here) written November 10, 1938, two days before her death. Also, Helen Zimmerman, as will be noted, supra, testified that in her opinion, Mrs. Kelsey, on the day the deed was executed, "was sane and capable of transacting business."

"There is a difference between the mental capacity required to sustain a deed made as a part of a business transaction, where each party endeavors and expects to get all the benefit he can, and a gift or will, where the only benefit the donor receives or expects is the satisfaction of benefiting the donee, or those near to him. If in such case he has mental capacity sufficient to know the extent of his property and his relatives and their claims on his bounty, he has sufficient capacity to make a will or deed of gift." Curtis et al. v. Alexander et al. (Mo. Sup.), 257 S. W. 432, l. c. 437; McFarland et al. v. Brown (Mo. Sup.), 193 S. W. 800, l. c. 804; Jones v. Thomas et al., 218 Mo. 508, l. c. 538, 117 S. W. 1177. In the Curtis case, supra, the court said [257 S. W. l. c. 437] that where there are only collateral heirs "there is no inclination on the part of the courts to look sourly on the preference or exclusion of one collateral relative over the other." See also Shaw et al. v. Butler (Mo. Sup.), 78 S. W. (2d) 420, l. c. 431.

We do not think and so rule that the evidence as to the condition of Mrs. Kelsey's mind was such as to justify overturning the finding of the chancellor below.

■ Confidential and fiduciary relations and undue influence are interrelated, hence we shall consider these subjects together. The terms *confidential* and *fiduciary* are in general application synonymous. "A confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other. The question in such case is always whether or not trust is reposed." Selle v. Wrigley, 233 Mo. App. 43, 116 S. W. (2d) 217, l. c. 221. In order for such relation to exist "there must be evidence of a special trust with respect to the property or business." Shaw case, supra, 78 S. W. (2d) l. c. 428; Hamlett v. McMillan et al. (Mo. Sup.), 223 S. W. 1069, l. c. 1074. Undue influence stems from the confidential or fiduciary relation, but influence to be undue must arise to the mark of such overpersuasion, coercion, force or deception as breaks the will power of the person overinfluenced and puts in its stead the will of another. Callaway v. Blankenbaker et al., ■ 346 Mo. 383, 141 S. W. (2d) 810, l. c. 815; Fessler et al. v. Fessler et al., 332 Mo. 655, 60 S. W. (2d) 17, l. c. 23,

and cases there cited; Hamilton et. al. v. Steininger et al., 350 Mo. 698, 168 S. W. (2d) 59, and handed down herewith.

This cause is in equity and is heard here de novo, and we pass on the weight of the evidence, Fessler case, supra, 60 S. W. (2d) 1. c. 23, but under the facts and the applicable law we would not be justified in overturning the finding below on the theory that the deed was procured by undue influence on the part of Mrs. Zimmerman.

The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.