CORRECTED 3/16/21



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| HOWARD SMITH, DARRELL SMITH, and HOWARD SMITH and DARRELL SMITH, IN THEIR CAPACITIES AS CO-TRUSTEES OF THE VIRGINIA MARIE SMITH REVOCABLE TRUST (AN INTER VIVOS TRUST AGREEMENT) EXECUTED ON JUNE 20, 2006, | ) ) ) ) ) ) ) ) | |
| | ) | WD83677 |
| | ) | (Consolidated with WD83783) |
| | ) | |
| Respondents, | ) | OPINION FILED: |
| v. | ) | March 16, 2021 |
| | ) | |
| | ) | |
| ROGER C. SMITH and LAVONNE MORRISEY, | ) ) | |
| | ) | |
| Appellants. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable Janet Sutton, Judge**

**Before Division Four:** Cynthia L. Martin, Chief Judge, and
Lisa White Hardwick and Mark D. Pfeiffer, Judges

Ms. Lavonne Morrisey ("Lavonne") and Mr. Roger C. Smith ("Roger") appeal from the

judgment of the Circuit Court of Clay County, Missouri ("trial court"), entered after a jury verdict

in favor of Mr. Howard Smith ("Howard") and Mr. Darrell Smith ("Darrell"), individually and in

their capacities as Co-Trustees of the Virginia Marie Smith Revocable Trust ("Trust"), in this declaratory judgment action to determine the validity of an amendment to said Trust.[1]  We affirm.

## Factual and Procedural Background[2]

Larry and Virginia Smith ("Larry" and "Virginia") lived in a 4,200-square-foot house on a 154-acre farm, later reduced to ninety acres, consisting of farmland and pastureland near Trimble, Missouri.  Larry managed the farming operation.  Virginia had chickens and was licensed to sell their eggs; she also worked outside the home as an accountant.  They had six children together: Dale, Howard, Darrell, Lloyd, Lavonne, and Roger.  Larry and Virginia had been married for forty-nine years when he died in 1999.  Virginia did not re-marry after Larry's death, and she lived by herself at the farm.  From 2000 through 2012, Howard managed the farm for Virginia.

In 2006, Virginia had her attorneys prepare The Virginia M. Smith Revocable Trust (An Inter Vivos Trust Agreement) dated June 20, 2006 ("Trust"), with Virginia as settlor and initial trustee.  The Trust named her children as beneficiaries, except for Dale, who was specifically omitted.  The Trust named Darrell and Howard as successor co-trustees in the event of Virginia's death or refusal or inability to act as trustee.  In the document, Virginia reserved the right to revoke or amend the Trust during her lifetime.

In 2007 and 2008, Darrell first noticed a decline in Virginia's mental acuity, marked by confusion, memory lapses, and losing her keys and her telephone.  Howard first noticed Virginia's dementia in 2009 when she no longer wanted to do the books for Smithville Lube, a business he,

---

[1] Because a number of the individuals involved in this case share the same surname, we will refer to them by their first names.  In doing so, no familiarity or disrespect is intended.

[2] In reviewing the trial court's denial of a motion for judgment notwithstanding the verdict, we view all evidence in the light most favorable to the jury's verdict, draw all reasonable inferences in the plaintiff's favor, and disregard all conflicting evidence and inferences.  *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 652 (Mo. banc 2019).  We need not consider contrary evidence on a substantial-evidence challenge, regardless of whether the burden of proof at trial was proof by a "preponderance of the evidence" or proof by "clear, cogent, and convincing evidence."  *Ivie v. Smith*, 439 S.W.3d 189, 200 (Mo. banc 2014).

Virginia, and Roger had purchased in 2004 or 2005. From 2009 to 2012, Howard noticed Virginia was gradually declining and her dementia was getting worse. Lloyd and his son Braden, who was then in seventh grade, moved in with Virginia during the summer of 2011 when there were signs that Virginia needed watching and help around the house. Lloyd starting documenting Virginia's symptoms when he was living with her in 2012. Darrell and Howard tried to discuss Virginia's dementia symptoms with Lavonne and Roger, but they were in denial and refused to talk about the situation. On October 29, 2012, Darrell called the Alzheimer's Association. He asked for advice and for someone to meet with Virginia. On November 1, 2012, an Alzheimer's counselor met with Virginia. Virginia's dementia was bad enough that Howard arranged for a CT scan of her head on November 12, 2012. The CT scan showed that she had suffered a small stroke and had a moderate-size brain tumor. The radiology results stated: "Clinical Indication: DEMENTIA."

Virginia's primary care physician and the Alzheimer's counselor faxed information to a doctor at the Rowe Neurological Institute. On November 27, 2012, Howard and Darrell were at the Institute for the appointment. Lavonne and Roger came in with Virginia forty-five minutes late. Because they were so late, the appointment was rescheduled for the following morning. The next morning when the family members were there, Lavonne came in with a power of attorney, showed it to the receptionist, and said, "Mom is not seeing the doctor today," and walked out. On November 30, 2012, Darrell and Lloyd filed a petition for appointment of guardian and conservator for Virginia.

Lavonne moved in with Virginia, Lloyd, and Braden in the summer of 2012. According to Braden, he, his father, and grandmother were a happy family until Lavonne moved in. After Lavonne moved in, there was "a lot more conflict and confrontation" in the house. Braden noticed Virginia talked to herself when doing dishes; she was argumentative and tearful, put raw

3

ingredients in food, locked herself out of the house multiple times at night, and once got lost when driving home from the grocery store. Braden was aware that Virginia began to wet the bed, and Lloyd would clean the sheets and mattress. Lloyd tried to talk with Virginia about the problem, but Virginia was in complete denial and was very short-tempered, almost throwing temper tantrums. Before Lavonne moved in, Virginia never used profanity when talking with Braden; but after Lavonne moved in, Virginia directed profanity at him, which was totally out of character. Also, after Lavonne moved in, Virginia asked Lloyd and Braden to leave. On November 30, 2012, as Lloyd and Braden were moving out, Virginia dumped a basket of Braden's wet clothes from the washer in the grass and told them to leave immediately.

On April 7, 2012, Howard and Virginia entered into a one-year farming lease agreement memorialized by a check in the amount of $11,400 for rent, which Virginia endorsed and deposited. Although Howard had managed the farm for Virginia from 1999 without compensation and for her financial benefit, in the fall of 2012, Virginia said that Howard was freeloading off of her and not paying her as much as he should.

On October 15, 2012, Howard received an unsigned letter purportedly from Virginia telling him that he was to remove all of his livestock from her property by November 30, 2012, and that he was not to have any contact with her for any reason in the interim. Howard did not consider the letter to be a legitimate letter from Virginia, because he knew Virginia did not operate a computer. On November 15, 2012, Howard received a notice from Virginia's attorney, demanding that Howard remove all livestock, machinery, equipment, and other personal effects and surrender possession of the farmland by November 30, 2012.

Thereafter, on February 19, 2013, Virginia filed an unlawful detainer and ejectment action against Howard. Howard counterclaimed for breach of the farming lease for which he had paid

4

$11,400 in rent. When the matter was tried in May 2013, Virginia did not know how many acres she owned and denied that Howard had paid her $11,400 for rent. The circuit court found that Howard had good intentions when he entered the rent agreement with Virginia. The circuit court entered judgment against Virginia on her petition and in Howard's favor on his counterclaim, awarding him $8,700 in damages, the amount he expended on seed for a crop he had been unable to tend due to the litigation. Howard did not attempt to collect on the judgment, and he vacated the farm in August or September 2013.

On January 24, 2013, between 9:30 and 10:00 a.m., Howard and Darrell arrived at the farm to feed Howard's bulls. The temperature was thirteen degrees and the windchill was ten degrees. When they came out of the pasture, Howard was sitting in his truck while Darrell was shutting the gate. Virginia came running out of the house in a light nightgown, waving a utility bill that she was concerned about. She started yelling at Howard about the high electric bill. Darrell "had never, ever in my entire life seen my mother like this. And I was really taken back because she was such an astute business woman and such a pleasant woman . . . so I was totally shocked." Howard said, "Calm down. Let's go in the house." Howard and Darrell spent thirty to forty-five minutes with Virginia. Howard wrote her a check for the electric bill, and two minutes later, Virginia had forgotten all about it and they had a normal conversation. During the conversation, Virginia related that a couple of days earlier, she had sustained a significant fall onto the concrete patio and bushes when she attempted to exit the east door of her house off the dining room. After confirming that she was okay, Howard and Darrell left and fed the cattle at Howard's other farms.

However, when Howard and Darrell returned about 3:30 p.m., a sheriff's deputy was leaving, and Roger and his wife Lori were there with Virginia. Not so coincidentally, Virginia

filed a police report, alleging that the bruises on her chest, arm, back, and shoulders were from a physical altercation with Darrell—and not related to her fall from two days earlier.

On October 8, 2013, Virginia had an appointment with neurologist Dr. Michael Schwartzman. She had been referred by a medical internist to Dr. Schwartzman for dementia.[3] Roger and Lori brought Virginia to the appointment. Dr. Schwartzman's notes from the visit stated that Roger informed the doctor that in the last two years Virginia had progressive cognitive decline, predominately in her short-term memory, and that she had one episode about two months before in which she thought someone was sleeping in her bed. After testing Virginia, Dr. Schwartzman concluded that Virginia had moderate dementia, most likely Alzheimer's. He recommended that the family consider moving Virginia to an assisted living facility.

On October 23, 2013, Virginia was admitted to the hospital because she had taken an entire week's worth of medication in one day. The medical records stated: "She has recently been diagnosed with Alzheimer's dementia and recently placed on Aricept. They have not noticed a significant difference since the initiation of the Aricept. Her mental status has progressed downward rather rapidly over the preceding 6 months" and included as a discharge diagnosis "Alzheimer's dementia."

Approximately one month later on November 19, 2013, Virginia executed an Amendment to the Trust ("Trust Amendment"), changing the distribution provisions so that the Trust property, including the farm, would go to Lavonne and Roger in equal shares as tenants in common. The Trust Amendment specifically omitted Dale, Darrell, Howard, and Lloyd as beneficiaries. The

---

[3] Dr. Schwartzman described dementia as:

a neurological condition that can affect multiple domains, predominantly memory. It can also affect insight and judgment. It can affect visual, spatial difficulties. And it can secondarily maybe cause the behavioral issues, as well. The predominant domain for dementia is memory, although there are other dementias where memory is not necessarily the main issue.

Trust Amendment provided that upon Virginia's death or refusal or inability to act as trustee, Lavonne and Roger would be successor co-trustees.

Dr. Suzanne Crandall, a neurologist, examined Virginia on February 10, 2014, and on November 7, 2014. She diagnosed Virginia with a mixed type of dementia, a combination of vascular dementia and Alzheimer's dementia. She also noted that Virginia suffered from psychosis (hallucinations and delusions) as reported by her family. She identified Virginia as an incapacitated person in that "[s]he cannot manage her own medications nor meal preparation, shopping, housekeeping, laundry, or personal care. And she would not be able to live alone without regular assistance from her family." The doctor also identified Virginia as a disabled person in that "she [cannot] manage a checkbook or pay her own bills." Dr. Crandall recommended assisted living as the least restrictive environment for Virginia. At the November 2014 appointment, Dr. Crandall noted that Virginia's family reported more behavior problems with hallucinations and wandering.

In February 2015, Virginia admitted to Lavonne that she had dementia. Virginia required full-time caretaking during the summer of 2015. Between June and November 2015, Virginia's condition declined further and, at Thanksgiving and again on Christmas Eve, Virginia didn't know who Lavonne was. Finally, on January 27, 2016, in the case filed by Darrell and Lloyd in 2012, the probate division of the circuit court entered a judgment of incapacity and disability and appointed a guardian of the person and a total conservator of the estate due to Virginia's "cognitive deficients" [sic] and incapacity and total disability. By March 2016, medical notes stated that Virginia had "advanced Alzheimer's disease." From 2016 until mid-2018, Virginia lived at Roger's house. Lavonne lived in Virginia's house and did not pay Virginia or the Trust rent.

7

On June 30, 2017, Howard and Darrell, individually and in their capacities as Co-Trustees of the Trust, filed a three-count petition for declaratory judgment to set aside the Trust Amendment to the Trust. In Count I, they sought a declaratory judgment voiding the Trust Amendment, alleging that Virginia lacked capacity at the time of execution of the Trust Amendment and that Lavonne and Roger unduly influenced her to amend the Trust. In Count II, they alleged that Lavonne and Roger breached their fiduciary duties as co-trustees and sought removal of Lavonne and Roger as co-trustees of the Trust. In Count III, they requested that the court require Lavonne and Roger to give a full and complete accounting of all property in their possession that belonged to Virginia or her Trust. With regard to Count III of the petition, the trial court ordered Lavonne and Roger to provide the court and all parties with a full and complete accounting. In response, Lavonne and Roger filed their accounting of trust assets and transactions from the time they assumed their duties on or about March 2016 until January 19, 2018.

Virginia moved to a nursing home in June or July 2018 because of her condition. Howard and Darrell were with Virginia at the nursing home when she died on January 22, 2019, at age 87.

On October 8, 2019, Lavonne moved the trial court to strike Howard and Darrell's demand for a jury trial and to set the case for a bench trial on the grounds that they were not entitled to a jury trial on their equitable claims. At a pre-trial conference held November 1, 2019, the trial court denied the motion. The trial court conducted a three-day jury trial. Howard, Darrell, Braden, Lavonne, and Roger were among the witnesses.

Lavonne disputed the accuracy of the 2012 medical records that showed the reason Virginia had the CT scan was because of dementia. She also disputed the accuracy of the medical records that showed Virginia was diagnosed as suffering from advanced dementia since July of 2013. Both Lavonne and Roger disputed the accuracy of Dr. Schwartzman's October 8, 2013 medical records,

8

which said that, according to *Roger*, Virginia had experienced progressive mental decline for *two years*. Lavonne testified that she did not believe the medical records because, "Roger would never say those words," and "Mom was handling herself really well." Lavonne also denied the accuracy of the October 23, 2013 medical records, which said Virginia took a week's worth of medication in one day, because "she didn't have a week's worth of medicine there." Lavonne claimed that she was "shocked" that she was a co-trustee under the Trust Amendment Virginia executed on November 19, 2013, and that she was "absolutely surprised and totally shocked" that she and Roger were getting everything. Roger testified that it was not important to him that, under the Trust Amendment, he and Lavonne alone would receive all of Virginia's assets. Roger and Lavonne both testified that the first time they noticed Virginia's dementia was in 2014. The jury's verdict demonstrated that it found Roger and Lavonne's testimony to be wholly lacking in credibility.

Lavonne and Roger moved for directed verdicts on all of Howard and Darrell's claims, which the trial court denied.

The jury returned verdicts in favor of Howard and Darrell and against Lavonne and Roger on both counts, finding that the Trust Amendment was not a valid amendment to the Trust. The trial court accepted the jury's verdicts. The trial court then entered a judgment declaring that the Trust Amendment was null and void because it was executed at a time when Virginia lacked sufficient mental capacity and was procured as a result of Lavonne and Roger's undue influence. Specifically, in the judgment entered November 13, 2019, the trial court found:

> that the Amendment to the Virginia Marie Smith Trust dated November 19, 2013 is not an amendment to the Virginia Marie Smith Trust because Virginia Marie Smith was not of sound and disposing mind and memory when she executed the document.

9

The Court further finds that the Amendment to the Virginia Marie Smith Trust dated November 19, 2013 is not an amendment to the Virginia Marie Smith Trust because Virginia Smith executed the document as the result of undue influence.

The trial court decreed that:

(a) The Virginia M[.] Smith Revocable Trust (An Inter Vivos Trust Agreement) dated June 20, 2006 is declared to be a valid trust indenture of Virginia Marie Smith and it is ordered that the same shall be duly registered as a valid trust indenture[.]

(b) The November 19, 2013 Amendment to the Virginia Marie Smith Trust is declared to be null, void and of no effect[.] Said instrument is hereby set aside and cancelled[.]

(c) Darrell Smith and Howard Smith are hereby declared to be the Successor Co-Trustees of the Virginia M[.] Smith Revocable Trust (An Inter Vivos Trust Agreement) dated June 20, 2006[.]

(d) Roger Smith and Lavonne Morrisey are hereby declared not to be the Successor Co-Trustees of the Virginia M[.] Smith Revocable Trust (An Inter Vivos Trust Agreement) dated June 20, 2006[.]

(e) Roger Smith and Lavonne Morrisey are hereby directed immediately to turn over all assets of the Virginia M[.] Smith Revocable Trust (An Inter Vivos Trust Agreement) dated June 20, 2006 to Darrell Smith and Howard Smith[.]

Lavonne and Roger filed a motion for judgment notwithstanding the verdict or alternatively a new trial ("JNOV"), which the trial court denied after a hearing.

Lavonne and Roger timely appealed. Additional facts will be discussed where relevant to the points on appeal.

**Standards of Review**

In Points I and II, Lavonne and Roger argue that the trial court erred in denying their motion for JNOV because there was insufficient evidence that Virginia lacked capacity to make the 2013 Amendment or was unduly influenced to do so. "'The standard for reviewing a denied motion for JNOV is essentially the same as for reviewing the denial of a motion for directed verdict.'" *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 652 (Mo. banc 2019) (quoting

10

*Sanders v. Ahmed*, 364 S.W.3d 195, 208 (Mo. banc 2012)). We will reverse the jury's verdict for insufficient evidence only when there is a complete absence of probative fact to support the jury's conclusion. *Id*. On a substantial-evidence challenge, "appellate courts view the evidence in the light most favorable to the circuit court's judgment and defer to the circuit court's credibility determinations." *Ivie v. Smith*, 439 S.W.3d 189, 200 (Mo. banc 2014). Further, "no contrary evidence need be considered on a substantial-evidence challenge, regardless of whether the burden of proof at trial was proof by a 'preponderance of the evidence' or proof by 'clear, cogent, and convincing evidence.'" *Id.* "Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Id.* at 199. Whether a plaintiff has made a submissible case is a question of law that we review *de novo*. *Darks v. Jackson Cnty.*, 601 S.W.3d 247, 254 (Mo. App. W.D. 2020).

In Point III, Lavonne and Roger assert that the trial court erred in granting Howard and Darrell a jury trial. Whether a party has a constitutional or statutory right to a jury trial is also a question of law that we review *de novo*. *Brainchild Holdings, LLC v. Cameron*, 534 S.W.3d 243, 245 (Mo. banc 2017).

## Analysis

### Burden of Proof

As a threshold matter, we clarify the parties' burdens of proof in cases challenging changes to estate planning documents, as "both parties bear burdens of proving different propositions." *Netherton v. Netherton*, 593 S.W.3d 654, 664 (Mo. App. W.D. 2019).

> Specifically, "[i]n a suit challenging the validity of a trust due to lack of mental capacity to execute such a document, the proponents of the document have the burden to establish a prima facie case of due execution and of sound mind of the person executing the trust at the time it was executed." *Cima v. Rhoades*, 416 S.W.3d 320, 323-24 (Mo. App. E.D. 2013). In other words, the "party seeking to establish an original or amended trust . . . must establish that the settlor acted with

11

adequate capacity." *Rouner* [*v. Wise*], 446 S.W.3d [242,] 251 n.7 [(Mo. banc 2014)]. "The capacity required to create, amend, revoke, or add property to a revocable trust . . . is the same as that required to make a will." § 456.6-601, RSMo 2016. The evidence relied upon to establish the capacity to execute a valid trust or trust amendment must be clear and convincing. *Rouner*, 446 S.W.3d at 252. Once the proponent of the trust document makes a prima facie showing, "the contestant must adduce substantial evidence that the settlor lacked mental capacity to execute the trust." *Cima*, 416 S.W.3d at 324. The burden of proving mental capacity remains with the proponents throughout the trial, however. *See Hall v. Mercantile Trust Co.*, 332 Mo. 802, 59 S.W.2d 664, 671-72 (1933).

*Id.* at 664-65.

Conversely, in describing the necessary burden of proof for a contestant of such a conveyance instrument asserting undue influence, the Missouri Supreme Court in *McCoy* stated:

We approach this character of case mindful, also, that "the cancellation of a [property conveyance] is the exercise 'of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case,' *Lastofka v. Lastofka*, 339 Mo. 770, 99 S.W.2d 46, 54 [(1936)], and the evidence to justify cancellation should be clear, cogent, and convincing." *Edinger v. Kratzer*, . . . 175 S.W.2d [807,] 813 [(Mo. 1943)], *Hedrick v. Hedrick*, 350 Mo. 716, 168 S.W.2d 69 [(1943)], *Hamilton v. Steininger*, 350 Mo. 698, 168 S.W.2d 59 [(1943)].

*McCoy v. McCoy*, 227 S.W.2d 698, 703 (Mo. 1950). The *McCoy* court went on to conclude that, "[t]o invalidate [property conveyances] such as these, there must be substantial evidence, or legal inference from record facts, that undue influence was present in active exercise and caused or assisted in causing the execution of the particular [property conveyances]." *Id.* at 706. "'There must be substantial proof of a pressure which overpowered the volition of the grantor or testator at the time the deed or will was made.'" *Creek v. Union Nat'l Bank in Kansas City*, 266 S.W.2d 737, 749 (Mo. 1954) (quoting *White v. McGuffin*, 246 S.W. 226, 231 (Mo. 1922)). That said, "[u]ndue influence may be established by circumstantial evidence." *Id.* at 748. But, whatever the quantity or quality of the substantial proof, *McCoy* clearly delineates that such substantial proof must be "clear, cogent, and convincing." *McCoy*, 227 S.W.2d at 703.

**Sufficiency of Evidence Challenges**

In Lavonne and Roger's first two points on appeal, they argue that the trial court erred in denying their motion for JNOV because there was insufficient evidence that Virginia lacked capacity to make the 2013 Amendment (Point I) or was unduly influenced to do so (Point II). We conclude that substantial evidence at trial demonstrated that Howard and Darrell met their burden of proving by clear, cogent, and convincing evidence that Virginia was unduly influenced to make the Trust Amendment.[4]

"Undue influence occurs when a party in a position of trust induces the other, by 'active conduct', to provide a substantial benefit through the transfer of property." *Nestel v. Rohach*, 529 S.W.3d 841, 845 (Mo. App. W.D. 2017) (internal quotation marks omitted). "Undue influence itself is usually defined as such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." *Id*. at 846 (internal quotation marks omitted). "In determining whether sufficient evidence supports a presumption of undue influence, we apply a case-by-case analysis because the exercise of undue influence is often proved by circumstantial evidence." *Id*. at 845 (internal quotation marks omitted). "Persons exerting undue influence will do so in as subtle, furtive, indirect and elusive a manner as possible and such influence may therefore be shown indirectly by the reasonable and natural inferences drawn from the facts and circumstances proved." *Id*. (internal quotation marks omitted). "[I]t is often impossible to set forth a rigid formula of what facts must be established to make a

---

[4] Given our ruling as to the sufficiency of evidence of undue influence (Point II), we need not and do not address Lavonne and Roger's additional challenge as to the sufficiency of evidence supporting the trial court's judgment as to Virginia's lack of capacity to make the Trust Amendment (Point I). *See Ivie*, 439 S.W.3d at 199 ("Because the findings of incapacity are sufficient to sustain the circuit court's judgment, this Court need not address the additional claims of undue influence.") (citing *Roberts v. BJC Health Sys.*, 391 S.W.3d 433, 437 (Mo. banc 2013) ("[A]ny trial court judgment[] can be affirmed on appeal by any appropriate theory supported by the record.")).

submissible case of undue influence by circumstantial evidence." *Id*. (internal quotation marks omitted).

"A presumption of undue influence arises . . . where substantial evidence shows (1) a confidential and fiduciary relationship; (2) benefaction to the fiduciary; and (3) some additional evidence from which undue influence may be inferred." *Id.* at 846 (internal quotation marks omitted). "Through the use of this presumption, Missouri places a prima facie case requirement upon the party alleging undue influence which once satisfied, allows the party to submit the case to the jury." *Watermann v. Eleanor E. Fitzpatrick Revocable Living Trust*, 369 S.W.3d 69, 75 (Mo. App. E.D. 2012) (internal quotation marks omitted).

> In cases tried by juries, the presumption of undue influence operates to create a submissible question for the jurors, who, after hearing rebuttal evidence from the proponent of the document, would determine from all the evidence whether the settlor was actually unduly influenced when he or she executed the trust.

*Cima v. Rhoades*, 416 S.W.3d 320, 324 (Mo. App. E.D. 2013).

Here, Howard and Darrell clearly presented both a submissible case and substantial evidence supporting the trial court's judgment relating to the claim that Virginia was unduly influenced by Howard and/or Lavonne to enter into the Trust Amendment.

First, substantial evidence showed Lavonne and Roger had a confidential or fiduciary relationship with Virginia. "A confidential relationship exists when one person relies on and trusts another with management of her property and attendance to her affairs, thereby creating some degree of fiduciary obligation." *Day v. Hupp*, 528 S.W.3d 400, 416 (Mo. App. E.D. 2017). "The relationship exists regardless of whether their interactions are technically fiduciary or merely informal[.]" *Duerbusch v. Karas*, 267 S.W.3d 700, 708 (Mo. App. E.D. 2008) (internal quotation marks omitted). "The evidence of the relationship need not be 'overwhelming,' but must merely show trust and reliance of one party by the other." *Id.* Roger had a power of attorney from

14

Virginia. He and Virginia were in business together for thirty-five years. Roger changed the registered agent for their business entity from Virginia to himself when Virginia was "having trouble keeping track of her important mail." Roger described his relationship with Virginia as "Close. Just—just close. We did everything together. We didn't fight. Just close." Lavonne also had a power of attorney from Virginia. Lavonne testified that in 1992, she started talking to Virginia on the phone every day, sometimes for four or five hours at a time.

Second, Lavonne and Roger do not dispute that they received a substantial bequest in the Amendment, to the exclusion of Howard, Darrell, and Lloyd. The beneficial results for Lavonne and Roger from Virginia's execution of the Trust Amendment were summarized in Roger's testimony:

Q. Your sister Lavonne lived in your mom's house from January 1, more or less maybe a few days, give or take, 2016 to now, correct?

A. Correct.

Q. As trustee for your mom, have you asked that that house and farm be sold?

A. No, I have not.

Q. Have you asked that Lavonne pay money into the trust to help pay your mom's bills?

A. No, we have not.

Q. So you and Lavonne, who you say get along with one another, have, on Lavonne's side, a house to live in rent-free, and on your side, you now have two strip malls worth over a million dollars, correct?

A. Correct.

Third, there was additional and substantial evidence from which undue influence may be inferred. "Missouri courts view the amount of evidence necessary to satisfy this prong liberally." *Duerbusch*, 267 S.W.3d at 709. Howard testified that when Larry was alive, he and Darrell and

15

Lavonne and Roger would get together at their parents' home quite often, and everyone got along. He first noticed Virginia's dementia in 2009 and it progressively got worse until, in 2012, he arranged for a CT scan of her head. According to Howard, everything was fine between Virginia and him, but things "[s]tarted getting bad in '10 and '11" when "Roger and Lavonne kept coming around." Lavonne moved in with Virginia in 2012, and Howard testified that after that, Virginia's behavior changed:

> Q. And until Lavonne moved in, had you ever seen your mom have outbursts of anger at you or Darrell?
>
> A. No. No.
>
> Q. That was just kind of a bright line. Before she moved in, she was pleasant, and after Lavonne moved in, Virginia was unpleasant?
>
> A. Correct.

Howard stated that in 2012, after Lavonne moved in, Virginia started having questions about her electric bill. Howard testified that he received a letter dated October 15, 2012, purportedly from Virginia, telling him, "You are required to vacate the premises," and, "You are not to have any contact with me." The letter was unsigned, and Virginia did not operate a computer and send letters. Howard testified that in January 2013, he showed Virginia the letter, and she told him, "I didn't do this," and "I don't know anything about it. I don't want you to leave."

Roger was with Virginia on November 12, 2012, when she went to see a doctor because of dementia and had a CT scan. Howard testified that Lavonne and Roger would not take Virginia to her appointment with a neurologist in November 2012, and that he and Darrell could not locate her for several days thereafter.

Braden, Lloyd's son and Virginia's grandson, testified about his observations during the time that he and Lloyd lived with Virginia:

16

Q. [W]hen did you and your dad move into live with your grandma Virginia?

A. Summer of 2011, I believe. I was going to enter seventh grade.
. . . .

Q. Okay. During the time, let's talk about when you and your dad first moved in. Who lived in the house?

A. Just my grandmother.

Q. Was everything good?

A. Yes, our relationship was really good.

Q. At some point in time, did your Aunt Lavonne Morrisey move in?

A. Yes, she did.

Q. And after she moved in, was there a change in the in the atmosphere in the house?

A. The environment was very different.

Q. How was it different?

A. I would say there was a lot more conflict and confrontation.

Q. Before she moved in—and by she, I mean Lavonne—was it a rather peaceful, tranquil house?

A. Yes.

Q. Full of love between relatives?

A. Yes.
. . . .

Q. Were there instances where your grandma, after Lavonne moved in, became argumentative and tearful?

A. Yes.

Q. Tell us about those situations.

17

A. Well, there would be multiple instances where she'd be upset. Sometimes she would just be crying. We wouldn't know what's going on or why. You'd just catch her just sitting there, crying.

Q. Was this different than before Lavonne moved in?

A. Yes.

. . . .

Q. Now, you, I would assume that you have known your grandma all your life?

A. Yes.

Q. And did you have a close and loving relationship with her?

A. Yes, I did.

Q. Before 2012, let's before Lavonne moved in, did your grandma ever use profanity directed at you?

A. No, sir.

Q. After Lavonne moved in and you said your grandma's mood changed?

A. Yes.

Q. Would she use profanity directed at you?

A. Yes.

Q. And I don't think we need to say the word. We can use the initial. What did she say to you?

A. Well, she'd use variety of words. She'd say "hell," "damn," she told me to go F myself.

Q. How many times did she tell you to go F yourself?

A. I probably say three to five times.

Q. And was this totally out of character with how she was?

A. Yes.

. . . .

18

Q.    Was there ever a time that you were fearful of some physical altercation with grandma?

A.    Yes, I've had a couple occasions to where I thought I had to brace myself for anything.

Q.    And was this towards the end of 2012?

A.    Yes.

Q.    And was this out of character with how your grandma was before Lavonne moved in?

A.    Yes.

Braden also related an incident that happened on November 30, 2012, as he and Lloyd were moving out: "I remember my grandmother came out with a basket of wet clothes that were mine that I had in the washer. I was trying to wash some clothes before I left, and she threw the basket out and all the clothes in the grass and she told us to leave now, or along the lines of that."

Howard testified that on January 24, 2013, when he and Darrell returned to Virginia's that afternoon (after having a good conversation with Virginia earlier in the day), Roger and his wife were there with Virginia, and a sheriff's deputy was leaving. Thereafter, Virginia filed a police report and asked for an order of protection against Darrell. Howard testified that in February 2013, Virginia sued him, saying that he had no right to be on her property. When they went to trial in May of 2013 and Virginia was on the witness stand, Howard had never seen Virginia so befuddled. Howard's attorney showed her the check for $11,400 for the rent payment for one year. Virginia denied it a couple times until the judge asked her, "Mrs. Smith, is that your signature on the back of that check?" She finally said, "Yes, it is." Howard clearly had the right as a lessee to be on the property.

Furthermore, "a settlor's mental and physical condition is highly material to the issue of undue influence because it would indicate whether the settlor was susceptible to undue influence."

19

*Cima*, 416 S.W.3d at 325 (internal quotation marks omitted). Howard testified that he first noticed Virginia's dementia in 2009 and that it progressively got worse until, in 2012, he arranged for a CT scan of her head. The radiology results stated: "Clinical Indication: DEMENTIA." Virginia's medical records from 2013 reflected that Virginia had been diagnosed with Alzheimer's dementia and that *Roger* had confirmed that Virginia had progressively suffered cognitive decline in the preceding two years. Specifically, in October 2013, Virginia had been admitted to the hospital because she had mistakenly taken an entire week's worth of medicine in one day. Her discharge diagnosis from that hospital admission was "Alzheimer's dementia" that had "progressed rapidly over the preceding 6 months." Not so coincidentally, one month later, Virginia executed the Trust Amendment, changing the distribution provisions so that Lavonne and Roger would become successor trustees and all of the Trust property would go to Lavonne and Roger upon Virginia's death; likewise, the Trust Amendment specifically omitted Dale, Darrell, Howard, and Lloyd as trust beneficiaries.

In Instruction No. 10, the trial court instructed the jury as follows:

In these instructions, you are told that your verdict depends on whether or not you believe certain propositions of fact submitted to you. The burden is upon the party who relies upon any such proposition to cause you to believe that such proposition is true by clear and convincing evidence[.]

The burden is upon Howard Smith and Darrell Smith to cause you to believe by clear and convincing evidence their claim of undue influence[.]

In determining whether or not you believe any proposition, you must consider only the evidence and the reasonable inferences derived from the evidence.

If the evidence in the case does not cause you to believe a particular proposition submitted, then you cannot return a verdict requiring belief of that proposition[.]

The trial court then defined "undue influence" in Instruction No. 11 as meaning: "such influence as destroys the free choice of the person making the document at issue." Finally, the trial court instructed the jury in Instruction No. 12 that: "Your verdict must be the Amendment to the Virginia Marie Smith Trust dated November 19, 2013 is a trust amendment of Virginia Marie Smith unless you believe that Virginia Marie Smith signed the document as the result of the undue influence of Defendant Roger Smith and/or Defendant Lavonne Morrisey."

Both the jury and the trial court found that Howard and Darrell met their burden to prove that Virginia had been unduly influenced to execute the Amendment. In Verdict B, the jury found that the Amendment was not an amendment to the Trust. The trial court accepted the jury's verdict and likewise found "that the Amendment to the Virginia Marie Smith Trust dated November 19, 2013 is not an amendment to the Virginia Marie Smith Trust because Virginia Marie Smith executed the document as the result of undue influence."

Viewing the evidence in the light most favorable to the jury's verdict and disregarding all conflicting evidence and inferences, as we are required to do, the trial court did not err in denying Lavonne and Roger's motion for JNOV because there was substantial evidence supporting the jury's and trial court's conclusion that there existed clear, cogent, and convincing evidence of undue influence by Lavonne and Roger impacting Virginia's execution of the Trust Amendment.

Point II is denied.

## Point III

In Lavonne and Roger's third point, they assert that the trial court erred in allowing Howard and Darrell to have a jury trial on their equitable claim to determine the validity of the Amendment.

The Declaratory Judgment Act provides that circuit courts of this state have power "to declare rights, status, and other legal relations." § 527.010.[5] Under section 527.040(3), the circuit court is authorized to make a declaration of rights with respect to a trust "[t]o determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings." The enumeration in section 527.040 "does not limit or restrict the exercise of the general powers conferred in section 527.010, in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty." § 527.050. Section 527.090 provides that "[w]hen a proceeding under [the Declaratory Judgment Act] involves the determination of any issue of fact, such issue may be tried and determined in the same manner as issues of fact are tried in other civil actions in the court in which the proceeding is pending."

"Declaratory judgment is *sui generis*, and is neither legal nor equitable." *Payne v. Cunningham*, 549 S.W.3d 43, 50 (Mo. App. E.D. 2018) (internal quotation marks omitted). "Labeling an action as 'equitable' or 'legal' typically refers to the type of relief being sought, but does not necessarily foreclose a party's right to trial by jury." *Id.* (internal quotation marks omitted). "'When a proceeding [for declaratory relief] involves the determination of an issue of fact, such issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions.'" *Id.* (quoting § 527.090; Rule 87.06).

In *Turnbull v. Car Wash Specialties, LLC*, 272 S.W.3d 871 (Mo. App. E.D. 2008), the trial court summarily denied Car Wash Specialties' request for a jury trial in the declaratory judgment action brought against it. The trial court based its decision solely on its characterization of declaratory judgment as an equitable action and failed to recognize that, in order to decide whether

[5] All statutory references are to the REVISED STATUTES OF MISSOURI 2016, as supplemented.

the plaintiffs were entitled to declaratory relief, certain factual determinations must first be made. *Id*. at 874. The *Turnbull* court concluded that, pursuant to section 527.090, in a trial on a petition for declaratory judgment, the trial court must determine what issues should be tried to the court and what issues should be reserved for the jury's determination. The *Turnbull* court then concluded that Car Wash Specialties was entitled to have factual questions (regarding the establishment of an implied easement) submitted to the jury for its determination. *Id.* After the jury makes the necessary findings of fact, the trial court can then properly determine the rights of the parties and enter declaratory judgment accordingly. *Id*. In *Turnbull* the court held that "[t]he trial court erred when it failed to submit to the jury the factual issues to be determined in the declaratory judgment action." *Id*. at 875.

In Count I of Howard and Darrell's petition for declaratory judgment, they sought a declaration that the Amendment was void because Virginia "lacked sound mind" and "was under the domination and undue influence" of Lavonne and Roger when she executed the Amendment. The primary issues were issues of fact that must be determined by a jury: whether Virginia was of sound mind when she executed the Amendment, and whether Virginia executed the Amendment as the result of the undue influence of Lavonne and/or Roger. The trial court did not err in submitting these issues of fact to the jury for determination.[6]

Point III is denied.

_____

[6] Irrespective to the failed argument that the trial court was not authorized to submit the contested factual issues to the jury in the below proceeding, we note that the trial court also separately made specific factual findings in its judgment that the Amendment was not an amendment to the Trust because Virginia "was not of sound and disposing mind and memory when she executed the document" and because she "executed the document as the result of undue influence."

23

**Conclusion**

The trial court's judgment is affirmed.

/s/ *Mark D. Pfeiffer*

Mark D. Pfeiffer, Judge

Cynthia L. Martin, Chief Judge, and Lisa White Hardwick, Judge, concur.

24